[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
AUGUST 25, 2000
THOMAS K. KAHN
CLERK

_____

No. 98-3577

_____

D.C. Docket No. 97-00320-5-CV

JOHN CHRISTO, JR., JOHN CHRISTO, III,
JAMES PHILLIP CHRISTO,
IRENE LAURETTE CHRISTO,

Plaintiffs-Appellants,

versus

KENNETH EARL PADGETT,

Defendant-Appellee.

_____

_____

No. 98-3663

_____

D.C. Docket No. 98-00038-5-CV-LAC
Bankruptcy Court No. 94-02031

IN RE: JOHN CHRISTO, JR.,

Debtor.

JOHN CHRISTO, JR.,

Plaintiff-Appellant,

versus

WILLIAM MILLER, Trustee,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Florida

_____

**(August 25, 2000)**

Before BLACK, CARNES and KRAVITCH, Circuit Judges.

KRAVITCH, Circuit Judge:

As we embark on this appeal, we must, in the apt words of the district court, "trudge down a long and winding road"[1] that has as much to do with the extensive history behind the original complaint as it does with the procedural complexities in its wake. The appeal requires us to consider, as a matter of first impression in this circuit, the interplay between the removal and remand statutes in relation to a pending bankruptcy case as well as the extent of our ability to review remand decisions in this context. We then evaluate the district court's denial of a recusal motion, its approval of a settlement agreement, and its grant of summary judgment

_____

[1] Order, Sept. 30, 1998, at 2, in R6, Tab 98.

2

on the ground of issue preclusion.  We conclude that we are without jurisdiction to review the district court's decision not to remand to the state court; we affirm the district court on all other grounds.[2]

## I.  BACKGROUND AND PROCEDURAL HISTORY

This appeal comes after a decade of civil, criminal, and bankruptcy proceedings concerning the Christo family and their investments in Bay Bank & Trust ("Bay Bank").  In the early 1990s, all of the outstanding stock of Bay Bank was owned by Florida Bay Banks ("FBB"), a one-bank holding company.  The majority of FBB's stock was owned by the J.C.J. Irrevocable Trust Agreement ("J.C.J. Trust") and the Bay Bank Company Employee Stock Ownership Plan ("ESOP").  John Christo, Jr. ("Christo, Jr.") established the J.C.J. Trust for the benefit of his three children, John Christo, III ("Christo, III"), James Phillip Christo ("Phillip Christo"), and Irene Christo.  Christo, III was the Trustee of both the J.C.J. Trust and the ESOP.  All three Christo children owned additional shares of common and preferred stock through the ESOP and individually.  Christo, Jr. individually owned approximately 97% of the preferred stock of FBB.

---

[2] Carried with this appeal was Padgett's motion to dismiss the appeal for want of jurisdiction due to the Christos' lack of standing to assert any claims that became property of the estate.  This argument is merely the obverse of the issues raised in this appeal as we would have had to consider all of the issues addressed herein before determining whether the Christos had standing. We therefore deny the motion to dismiss the appeal as moot.

3

FBB defaulted on a $4.5 million loan from SouthTrust Bank secured by all of FBB's stock in Bay Bank and guaranteed individually by Christo, Jr. Litigation between the Christos and SouthTrust ("the SouthTrust litigation") led to a settlement agreement providing for a court-ordered sale of the Bay Bank stock. The impending auction imperiled the Christos' ongoing negotiation with Union Planters Corporation ("Union Planters") for a stock purchase of Bay Bank because Union Planters could not complete its due diligence prior to the date of the auction, and Union Planters was unsuccessful in postponing the auction for additional time in which to consummate the deal.

The auction was scheduled for September 30, 1993. The night before the auction, Christo, Jr. contacted a lifetime friend and former officer of Bay Bank, Kenneth Earl Padgett, and asked him to attend the auction and purchase Bay Bank. Christo, Jr. provided Padgett a cashier's check for $250,000, cobbled from various sources, to secure Padgett's ability to bid. According to Christo, Jr., Padgett attended the auction with the understanding that, if Padgett were the successful bidder, he would assign his bid to Union Planters. Padgett refutes that such an agreement ever existed and contends that, although he considered the purchase out of respect for his friendship with Christo, Jr., his decision to bid on the auctioned bank was for his profit alone.

At the auction, Padgett and SouthTrust were the major bidders for the Bay Bank stock, and Padgett was the successful bidder with a final bid of $8.5 million. Shortly after the auction, SouthTrust filed pleadings with United States District Court Judge Lacey A. Collier, who had presided over the earlier SouthTrust litigation and settlement. SouthTrust sought to set aside Padgett's purchase on the basis that he was merely a "strawman" for Christo, Jr., which would foreclose regulatory approval, and also sought to re-auction the Bay Bank stock. The district court conducted a contempt hearing on November 16, 1993, at which it directed the Christo family, Padgett, and others to appear to show cause why they should not be held in contempt of the court's prior order directing the sale of the Bay Bank stock. At that hearing, Padgett testified that he acted on his own, and denied that there had ever been an agreement between he and the Christos concerning the purchase of Bay Bank. The Christos did not present any contrary evidence. The court denied SouthTrust's motion to set aside the sale, but reserved ruling on the motion for contempt.[3]

While Padgett awaited final regulatory approval for his purchase of Bay Bank, Christo, Jr. filed a bankruptcy petition under Chapter 7 on February 16, 1994. In the petition, Christo, Jr. did not list as property of his estate any interest

---

[3] It appears the district court never ruled on this motion.

5

in Bay Bank or any contractual rights with Padgett. In 1996, upon information received from one of the Christo children, the Trustee in Christo, Jr.'s bankruptcy case, William Miller, filed a four-count complaint against Padgett based on an alleged breach of an oral contract to turn over control of Bay Bank to the Christos ("the Miller litigation"). The Trustee voluntarily dismissed the two claims seeking to enforce the alleged oral agreement and unsuccessfully litigated the remaining claims. Miller initially filed a notice of intent to abandon the dismissed claims, but Padgett objected. Miller and Padgett then reached a settlement agreement on all claims relating to the sale of the Bay Bank stock; the settlement was contingent on the court finding that the Trustee had succeeded to any claim relating to Padgett's alleged agreement to buy Bay Bank on behalf of the Christos.

On November 14, 1997, the Christo family filed a complaint against Padgett in Florida state court in which they alleged that Padgett breached an oral contract with Christo, Jr. to purchase Bay Bank at auction on their behalf ("the Christo litigation").[4] Padgett removed the case to federal court, after which it was transferred to Judge Collier. The Christo family moved to remand and for the

---

[4] Padgett suggests that the Christos' complaint should be barred by the statute of limitations because they were first notified that he denied the existence of a contract in documents served on November 12, 1993. Because there is some question about whether the documents were received on that date, see Tr. of June 30, 1998 Hr'g at 121-23, in R11 (testimony of Irene Christo), we would not affirm the district court's dismissal on this basis.

6

judge's recusal. The district court deferred ruling on the motion to remand but denied the request for recusal.

After the Trustee and Padgett moved for the district court to approve the settlement in the Miller litigation, Christo, Jr. objected, and the court held an evidentiary hearing, applicable to both the Miller and Christo litigations, concerning any alleged agreement between Padgett and the Christo family. In a July 13, 1998 Order, the court found that there was no enforceable agreement, and that even if there were, it would only have been between Padgett and Christo, Jr., in which case Christo, Jr.'s interest in the agreement would have passed to his bankruptcy estate. The district court then referred the proposed settlement to the bankruptcy court for a Report and Recommendation on whether, in light of the district court's findings, the proposed settlement was in the best interest of Christo, Jr.'s estate.

On October 1, 1998, the district court denied the Christos' earlier motion to remand and dismissed their civil lawsuit on grounds of issue preclusion based on its findings in the July 13 order. The bankruptcy court recommended approving the proposed settlement and, on October 22, 1998, the district court adopted the recommendation and approved the settlement between Padgett and the Trustee.

7

We hear this matter on a consolidated appeal.[5]

## II. DISCUSSION

A. Removal and Remand

In response to the Christos' state court complaint, Padgett timely sought removal to the United States District Court for the Northern District of Florida,[6] where Christo, Jr.'s bankruptcy case was pending; the Christos responded with a motion to remand.[7] In their remand motion, the Christos requested both that the district court abstain as mandated by 28 U.S.C. § 1334(c)(2), and remand on

---

[5] Although the district court consolidated the two causes of action for the purpose of different oral arguments, see Order, Jan. 6, 1998, in R1, Tab 16; Order, Jan. 29, 1998, in R2, Tab 42, it ultimately denied Padgett's motion to consolidate as moot after it dismissed the Christos' complaint, see Order, Sept. 30, 1998, in R6, Tab 94.

[6] Courts have split on whether 28 U.S.C. § 1446(b) (governing removals generally) or Bankruptcy Rule 9027 provides the appropriate time period for filing a notice of removal in cases related to a bankruptcy proceeding. *See* Hon. Thomas B. Bennett, *Removal, Remand, and Abstention Related to Bankruptcies: Yet Another Litigation Quagmire!*, 27 Cumb. L. Rev. 1037, 1057-59 (1997). Under either provision, however, Padgett's removal, sought within 30 days, was timely. *See id*.

[7] It is less clear whether the Christos' remand motion, filed 38 days after the Notice of Removal, was timely because the statute does not define "timely," and the Bankruptcy Rules provide no guidance on this issue. Courts appear to have adopted a case-by-case approach. See, e.g., Adams v. Grand Traverse Band of Ottawa & Chippewa Indians Econ. Dev. Auth. (In re Adams), 133 B.R. 191, 195 (Bankr. W.D. Mich. 1991) (remand sought 21 days after removal was timely); Strutz v. Hoechst Celanese Corp. (In re United States Brass Corp.), 173 B.R. 1000, 1004 (Bankr. E.D. Tex. 1994) (remand motion filed 13 days after removal was timely); Waugh v. Eldridge (In re Waugh), 165 B.R. 450, 452 (Bankr. E.D. Ark. 1994) (unexcused delay of four months after removal was not timely). Padgett has not challenged the timeliness of the remand motion and we will assume, without deciding, that a motion for remand filed 38 days after removal is timely for purpose of § 1334.

prudential grounds as warranted by 28 U.S.C. § 1452. Section 1334 provides district courts with "original and exclusive jurisdiction of all cases under title 11" and "original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11." 28 U.S.C. §§ 1334(a) & (b) (2000). Section 1452 provides that "[a] party may remove any claim or cause of action in a civil action . . . to the district court for the district where such civil action is pending, if such district court has jurisdiction of such claim or cause of action under section 1334 of this title." Id. § 1452(a).

1. *Does Mandatory Abstention Apply in Removed Cases?*

As an initial matter, we address a controversy that has arisen among other courts: whether mandatory abstention under § 1334(c)(2) applies to cases removed under § 1452. Several courts, focusing on § 1334(c)(2)'s requirement that "an action is commenced, and can be timely adjudicated, in a State forum of appropriate jurisdiction," have concluded that a parallel state court proceeding is a prerequisite of mandatory abstention. Under this interpretation, once a state law action is removed, there no longer remains an action "commenced . . . in a State forum." See, e.g., Southern Marine & Indus. Servs., Inc. v. AK Eng'g, Inc. (In re AK Servs., Inc.), 159 B.R. 76, 83-84 (Bankr. D. Mass. 1993); Paul v. Chemical Bank (In re 666 Assocs.), 57 B.R. 8, 12 (Bankr. S.D.N.Y. 1985).

9

The vast majority of courts, however, have concluded to the contrary on the reasoning that the removed state law action has been "commenced" and, upon remand, would remain capable of timely adjudication in state court. See Southmark Corp. v. Coopers & Lybrand (In re Southmark Corp.), 163 F.3d 925, 929 (5th Cir. 1999); Robinson v. Michigan Consol. Gas Co., 918 F.2d 579, 584 n. 3 (6th Cir. 1990); Williams v. Shell Oil Co., 169 B.R. 684, 690-92 (S.D. Cal. 1994); Baxter Healthcare Corp. v. Hemex Liquidation Trust, 132 B.R. 863, 869 n.7 (N.D. Ill. 1991). In our view, this latter interpretation better comports with the plain language of § 1334(c)(2) as well as Congress's intent that mandatory abstention strike a balance between the competing interests of bankruptcy and state courts. See 130 Cong. Rec. S8,8889 (daily ed. June 29, 1984) (statement of Sen. Dole) (describing the original mandatory abstention provision as a compromise between the House and Senate "that preserved the integrity of bankruptcy jurisdiction while allowing abstention for personal injury cases where they can be timely adjudicated in State courts"). We therefore hold that § 1334(c)(2) applies to state law claims that have been removed to federal court under § 1452(a).

*2. Review of the District Court's Remand Decision*

Section 1334(c)(2), enacted in the Bankruptcy Amendments and Federal

10

Judgeship Act of 1984, Pub. L. No. 98-353, July 10, 1984, 98 Stat. 333, originally provided that "[a]ny decision to abstain made under this subsection is not reviewable by appeal or otherwise." In 1990, Congress amended section 1334(c)(2) to remove appellate review from all decisions to abstain or not to abstain. See Collier on Bankruptcy § 3.05[6][a] (Lawrence P. King, ed. 15th rev. ed. 2000). With the Bankruptcy Reform Act of 1994, Congress renumbered § 1334 and recreated appellate review only for those decisions by a district court *not* to abstain under § 1334(c)(2), the new mandatory abstention provision. See 28 U.S.C. § 1334(d) (2000). The Christos argue that the district court was required to abstain under § 1334(c)(2) because: (1) he made a timely motion to remand; (2) in a proceeding based upon a state law claim or state law cause of action; (3) that was related to a case under title 11 but not arising under title 11 or arising in a case under title 11; (4) which could not have commenced in federal court absent jurisdiction under § 1334; and (5) which has been commenced and can be timely adjudicated in a state forum of appropriate jurisdiction.

Before we consider whether the elements of mandatory abstention were present, we must first determine whether § 1334(d), which would grant us power to make that consideration, applies in this case. Section 1334(d) was one of many amendments to the bankruptcy code in the 1994 Act. The 1994 Act provided that

11

its amendments to the Code were, with limited exception, prospective and therefore would apply only to cases filed after the effective date of the Act, October 22, 1994. As applied to § 1334(d), the legislative history is clear that:

> subsection (b) operates prospectively and applies only to cases filed after the effective date of the Act. Accordingly, it does not make existing orders appealable. Any future decisions not to abstain, if made in cases filed before the effective date of the Act, would [] be governed by present law and thus would not be appealable to the Circuit Court of Appeals.

H.R. Rep. No. 103-835 at 37. What is less clear, however, is whether the term "cases" as used in the Act and its history refers to the bankruptcy case or the civil case which was removed. Because Christo, Jr.'s bankruptcy petition was filed before the October 22, 1994 enactment date, and his civil case filed after, this distinction is critical to our determination of our jurisdiction to review the district court's remand decision.

Although at first blush the civil case would appear to be the determining case, the language used throughout the Act suggests otherwise. The 1994 Act consistently, even if not constantly, denotes the original bankruptcy case filed under Title 11 as "case" and applies other terms, such as "proceedings" or "actions," to other causes of action. This practice dates back to the original Bankruptcy Act of 1978, in the which the term "case" referred to the original bankruptcy petition. See Young v. Sultan Ltd. (In re Lucasa Int'l Ltd.), 6 B.R. 717,

12

719 n.5 (Bankr. S.D.N.Y. 1980) ("In the context of the jurisdictional grants given by the 1978 statute, the word 'case' refers to the commencement of a bankruptcy by the filing of a petition by a debtor under Sections 301-303 [of the Bankruptcy Code]"); Hon. Roy Babitt, *The Bankruptcy Court, Its Judges, Their Jurisdiction and Powers and Appeals, Under Title II of the 1978 Bankruptcy Reform Act: Transition and Beyond*, 1979 Ann. Surv. Bankr. L. 89, 103 (emphasizing "that the word 'case' here means the commencement of the Bankruptcy Court's judicial and administrative process from the filing of the petition"), quoted in Ralph Brubaker, *On the Nature of Federal Bankruptcy Jurisdiction: A General Statutory and Constitutional Theory*, 41 Wm. & Mary L. Rev. 743, 941 n.359 (2000).

Further support derives from the assumption, albeit without discussion, by most courts and commentators that the filing of the bankruptcy case determines the applicability of the 1994 Act. See In re Southmark, 163 F.3d at 928-29; Security Farms v. International Broth. of Teamsters, 124 F.3d 999, 1009 n.9 (9th Cir. 1997); Collier on Bankruptcy, supra, § 3.05[6][a]. But cf. Schuster v. Mims (In re Rupp & Bowman Co.), 109 F.3d 237, 238-39 (5th Cir. 1997) (using date of amended state law claim to determine when § 1334(d) governs). Finally, the Act's application provision states unequivocally that "the amendments made by this Act shall not apply with respect to cases *commenced under Title 11* of the United States

Code before the date of the enactment of this Act." The Bankruptcy Reform Act of 1994, Pub. L. No. 103-394, § 702(b), 108 Stat. 4106, 4150 (emphasis added).

Based on the foregoing, we conclude that the date on which the original bankruptcy case was filed under Title 11 of the United States Code determines whether § 1334(d) applies. Because Christo, Jr. filed his bankruptcy petition on February 16, 1994, several months before the effective date of the 1994 Act, section 1334(d) does not apply; we therefore are without jurisdiction to review the district court's decision not to remand under § 1334(c)(2).[8]

## B. Motion to Recuse

Shortly after the Christos' state law claims were transferred to Judge Collier, the Christos moved for his recusal pursuant to 28 U.S.C. § 144. The judge denied the motion after considering both 28 U.S.C. §§ 144 and 455.[9] We review a district court's refusal to recuse for abuse of discretion. See Diversified Numismatics, Inc. v. City of Orlando, 949 F.2d 382, 384-85 (11th Cir. 1991); United States v.

---

[8] Nor would we have power to review a declination of remand on any other grounds. The review afforded under § 1334(d) does not apply to § 1334(c)(1), which provides for discretionary remand, and decisions not to remand for equitable reasons pursuant to § 1452 are "not reviewable by appeal or otherwise by the court of appeals under section 158(d), 1291, or 1292 of this title." 28 U.S.C. § 1452(b) (2000).

[9] The judge, noting that no motion was required, considered *sua sponte* whether it was appropriate to recuse himself under 28 U.S.C. § 455. See Order, Jan. 28, 1998, at 4, in R2, Tab 41.

14

Meester, 762 F.2d 867, 885 (11th Cir. 1985).[10]

Section 144 provides:

> Whenever a party to any proceeding in a district court makes and files a timely and sufficient affidavit that the judge before whom the matter is pending has a personal bias or prejudice either against him or in favor of any adverse party, such judge shall proceed no further therein.

28 U.S.C. § 144 (2000). To warrant recusal under § 144, the moving party must allege facts that would convince a reasonable person that bias actually exists. See Phillips v. Joint Legislative Comm. on Performance & Expenditure Rev., 637 F.2d 1014, 1019 n.6 (5th Cir. Unit A Feb. 1981).[11] Properly pleaded facts in a § 144 affidavit must be considered as true. See id. at 1019.

Section 455 requires that a judge disqualify himself "in any proceeding in which his impartiality might reasonably be questioned" or "[w]here he has a personal bias or prejudice concerning a party." 28 U.S.C. §§ 455(a) & (b)(1) (2000). Under § 455, the standard is whether an objective, fully informed lay observer would entertain significant doubt about the judge's impartiality. See United States v. Kelly, 888 F.2d 732, 744-45 (11th Cir. 1989).

---

[10] Padgett suggests that the Christos should have sought review of the judge's refusal to recuse by writ of mandamus; recusal orders, however, are reviewable on appeals from final judgment. See Diversified Nurismatics, 949 F.3d at 384.

[11] Decisions of the former Fifth Circuit issued prior to October 1, 1981, are binding precedent on this court. See Bonner v. City of Prichard, 661 F.2d 1206, 1207 (11th Cir. 1981).

15

In his affidavit supporting the recusal motion, Christo, Jr. emphasizes two examples of Judge Collier's alleged bias: (1) his disparaging remarks concerning the Christos' "Never" campaign;[12] and (2) his sentencing, which was later reversed on appeal, of Christo, III on an erroneous conviction for money laundering.[13]

Neither of these grounds warranted Judge Collier's recusal. As for the judge's statements concerning the "Never" campaign, the Supreme Court has held that "judicial remarks . . . that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge. They *may* do so if they reveal an opinion that derives from an extrajudicial source; and they *will* do so if they reveal such a high degree of

---

[12] The "Never" public relations campaign represented the Christo family's opposition to SouthTrust (or any other "outsider") obtaining control of Bay Bank as a result of SouthTrust's foreclosure. During the November 16, 1993, contempt hearing, Judge Collier referred to the "Never" campaign several times. As illustration, Christo, Jr. cites Judge Collier's statement that:

> Anyone who uses court proceedings for personal endeavors or publicity advantage to me is engaged in contemptuous conduct, and this court will not be used to further any personal agenda by anyone, either side. The court process is simply not to be a part of any circus whatsoever. Press conferences to file lawsuits, to have Never campaigns, use the court in that campaign certainly is borderline conduct for any party that is before the court, and it will simply not be tolerated.

Christo, Jr. Aff. ¶ 14, in R1, Tab 34.

[13] On appeal, this court found insufficient evidence of money laundering and remanded with instructions to sentence Christo, III for a lesser offense. See United States v. Christo, 129 F.3d 578, 581 (11th Cir. 1997). It bears mention, however, that Judge Collier also awarded Christo, Jr. an extremely light sentence for his conviction of conspiracy to defraud a bank. See Christo, Jr. Dep. at 27, in R3, Tab 67, Ex. 2.

16

favoritism or antagonism as to make fair judgment impossible." Liteky v. United States, 510 U.S. 540, 555, 114 S. Ct. 1147, 1157 (1994). Evidence of the "Never" campaign was, among other things, presented to the court in newspaper articles attached to filed motions,[14] and there is no evidence that Judge Collier formed an opinion about the campaign based on extrajudicial sources. In addition, Judge Collier's admonition that the court would not be used to further the personal agenda of either party reveals no improper partiality or hostility to either party. Nor did Judge Collier's occasional expressions of frustration with the Christo family warrant recusal.[15] See Hamm v. Members of Bd. of Regents, 708 F.2d 647, 651 (11th Cir. 1983) ("Neither a trial judge's comments on lack of evidence, rulings adverse to a party, nor friction between the court and counsel constitute pervasive bias."). Indeed, in light of the somewhat arduous path this litigation has followed, Judge Collier demonstrated commendable equanimity during all

---

[14] See Tr. of Nov. 16, 1993 Hr'g at 25, in R1, Tab 13, Ex. 1. Judge Collier mentioned this during oral argument on the recusal motion. See Tr. of Jan. 23, 1998 Hr'g at 16, in R9, Tab 48.

[15] The Christos' chief example is Judge Collier's remark at the November 16, 1993, contempt hearing:

> [A]t the outset, the Court wants to make it crystal clear to all involved in this case, parties and counsel, that it intends to get to the bottom of this mess, including the question of whether Mr. Padgett's purchase of the stock was a legitimate purchase, or whether he was merely a "strawman" for the Christos, and rue the day should the Court discover that the transaction was a sham.

Christo, Jr. Aff. ¶ 5, in R1, Tab 34.

proceedings.

We also reject the suggestion that the judge's prior sentencing of Christo, III and his having presided over other litigation involving the Christo family required his recusal from this case. Although Judge Collier had heard the evidence leading to Christo, III's conviction, there is nothing in Christo, Jr.'s affidavit that would cast doubt on Judge Collier's impartiality. The mere fact of having presided over previous criminal or civil trials involving the same parties does not mandate recusal from all future litigation involving those parties. See Steering Comm. v. Mead Corp. (In re Corrugated Container Litig.), 614 F.2d 958, 964 (5th Cir. 1980); see also Jaffe v. Grant, 793 F.2d 1182, 1189 n.4 (11th Cir. 1986) ("Factual knowledge gained during earlier participation in judicial proceedings involving the same party is not sufficient to require a judge's recusal.").

C. Approval of Settlement Agreement

The proposed settlement between Miller and Padgett provided for: (1) a general and mutual release of all claims among all parties (e.g., Padgett's claims for sanctions and abuse of process for Miller's former suit to enforce the purported contract with Christo, Jr., and Miller's ability to revive that same suit); (2) Bay Bank's subordination of all but one of its claims against the estate; and (3) a payment by Padgett and/or Bay Bank to the estate of $10,000-$15,000, depending

18

on the costs associated with the settlement. The agreement also called for declarations that Christo, Jr. alone owned any cause of action against Padgett for his purchase of the Bay Bank stock, that any cause of action had been transferred to the Trustee, and that no third parties would be able to pursue such a cause of action.[16]

Based on the evidence presented at the June 30, 1998 hearing, the district court made the following preliminary findings: (1) that there was never an agreement between Christo, Jr. and Padgett for Padgett to purchase the Bay Bank stock at the foreclosure sale on behalf of the Christos; (2) that even if there had been an agreement, it was solely between Christo, Jr. individually and Padgett; and (3) that any claim Christo, Jr. might have had was transferred to the Trustee as part of the bankruptcy estate.[17] The district court then referred the settlement agreement to the bankruptcy court to determine whether, in light of its findings, the proposed settlement was in the best interests of the estate.

The bankruptcy court cited the relevant factors when reviewing a proposed settlement agreement: (1) the probability of success in litigation; (2) the difficulties to be encountered in collection; (3) the complexity, expense, inconvenience, and

---

[16] See Settlement Agreement at 7-9, in R7, Tab 9.

[17] See Order, July 13, 1998, at 3-4, in R7, Tab 14.

delay involved in the litigation; and (4) the paramount interest of the creditors. See

Wallace v. Justice Oaks II, Ltd. (In re Justice Oaks II, Ltd.), 898 F.2d 1544, 1549

(11th Cir. 1990). The bankruptcy court found that these four factors weighed in

favor of approving the settlement.[18] Although the bankruptcy court noted the

district court's finding that there was no enforceable contract between Christo, Jr.

and Padgett, it found that Padgett and Bay Bank's opposition to the Trustee's

abandonment of those claims to the Christos suggested that success on those claims

was not out of the question. And although the bankruptcy court foresaw no

difficulty in collection, it found that the complexity and expense involved in

litigation were likely to be considerable. Most importantly, the bankruptcy court

emphasized that approval of the settlement would allow the creditors, who had

been waiting for four years, to be paid, and recommended approving the

settlement.[19] The district court adopted the recommendation.[20]

The Christos challenge the settlement agreement as illegal and spurious.

Arguing that all claims but Bay Bank's were "shams," the Christos contend that

Padgett used the agreement to misapply Bay Bank's fund for his own benefit, and

---

[18] See Report & Recommendation at 5, in R8, Tab 23.

[19] See id. at 4-5.

[20] See Order, Oct. 22, 1998, in R8, Tab 24.

20

charge the Trustee as a possible abettor.  In response, Padgett questions the Christos' standing either to contest the legality of the Trustee's decisions or to purport to speak on Bay Bank's behalf.  Padgett also maintains the legality and propriety of the settlement agreement.[21]  We review an approval of a settlement agreement under the abuse of discretion standard.  See Leverso v. SouthTrust Bank of Ala., 18 F.3d 1527, 1531 (11th Cir. 1994).[22]

We agree with Padgett that the Christos lack standing to assert Bay Bank's interest.  Whether the Christos have standing to challenge the settlement agreement on any other grounds depends, in turn, on whether they had an agreement with Padgett.  If such an agreement existed, any party to that agreement would have standing to protect his or her pecuniary interest in it.  If there was no agreement between Padgett and the Christos, however, then the Christos would have no basis to challenge approval of the settlement agreement between Padgett and Miller.

Turning first to the terms of the agreement, we cannot agree with the

---

[21] Padgett argues that the Christos waived their illegality argument by failing to raise it below.  Although the Christos did not contest the agreement's legality in their response to Padgett's motion to approve the settlement, they did raise this issue during the June 30, 1998, evidentiary hearing, see Tr. of June 30, 1998 Hr'g at 33, in R11, and in their subsequent motion for reconsideration of the court's July 13, 1998 order, filed several months before the district court's order approving the settlement.  See Mem. of Law in Supp. of Mot. for Reh'g and Recons. at 19, in R7, Tab 18.

[22] The Christos suggest that a settlement agreement is a contract and therefore should be reviewed *de novo*; this court is not interpreting the settlement agreement, however, but rather deciding whether it was properly approved.

Christos' characterization of the settlement agreement as possibly "the most self-serving document ever drafted."[23] Even if the likelihood of Padgett succeeding in his claim for sanctions against Miller was slight, the bankruptcy court correctly noted that defense of any litigation, even that which is frivolous, is both time-consuming and costly.[24] Based on the findings of the district court, approving the settlement agreement was not an abuse of discretion.

This leaves the question of the propriety of the district court's findings upon which approval of the agreement was predicated. We review a district court's factual findings for clear error and its conclusions of law *de novo*. See General Trading Inc. v. Yale Materials Handling Corp., 119 F.3d 1485, 1494 (11th Cir. 1997). The district court noted that there was some evidence of an agreement between Christo, Jr. and Padgett, but it concluded that this evidence was "not credible and deserves no weight."[25] The district court further found that, even if there had been an agreement, there was no evidence that the agreement had been

---

[23] Pls.' Mem. of Law in Resp. to Def.'s Mot. to Dismiss and Opp'n to Approval of Settlement Agreement at 7 n.5, in R7, Tab 10.

[24] See Report & Recommendation at 5, in R8, Tab 23. Although the Christos dismiss the claim for sanctions with the observation that "[s]o rarely are sanctions awarded it is a wonder that any but the least experienced and most ill-prepared trial attorney gives the threat a second thought," Pls.' Mem. of Law in Resp. to Def.'s Mot. to Dismiss & Opp'n to Approval of Settlement Agreement at 8 n.6, in R7, Tab 10, we cannot agree that claims for sanctions carry so little force.

[25] Order, July 13, 1998, at 4, in R7, Tab 14.

22

between anyone other than Padgett and Christo, Jr..

After review of the record, we cannot say these findings were clearly erroneous. At the June 30, 1998, hearing, Christo, Jr., Phillip Christo, and Irene Christo[26] all testified that Padgett had agreed to bid on the Bay Bank stock with the understanding that he would then assign his bid to Union Planters. None of them were able to articulate the particulars of this agreement, or explain what would happen if Union Planters no longer wanted the bank after Padgett bought it. The other evidence of the agreement found in the record comes primarily from Christo, Jr.'s own, often inconsistent, testimony, although there is also evidence from Phillip Christo;[27] Irene Christo;[28] Frank Wood, a former executive of Union Planters and later officer of Bay Bank and fiancé of Irene Christo;[29] Charles Hilton, frequent borrower from Bay Bank and erstwhile counsel to both Christo, Jr. and Padgett,[30] and Benjamin W. Rawlins, Jr., Chairman of the Board of Union

---

[26] Christo, III did not testify at the hearing.

[27] See Phillip Christo Aff. ¶ 13, in R5, Tab 84.

[28] See Irene Christo Aff. ¶ 12, in R6, Tab 89.

[29] See Wood Aff. ¶ 9, in R6, Tab 89.

[30] See Hilton Aff. ¶ 5, in R5, Tab 84.

Planters.[31]  Close examination of their testimony, however, reveals that their knowledge of the agreement came almost exclusively from inferences and statements from Christo, Jr.[32]  Indeed, throughout Christo, Jr.'s deposition testimony, he provided scant corroboration of his version of events.[33]

In addition, we agree with the district court that the evidence presented at the June 30 evidentiary hearing suggested, at most, that Christo, Jr. and Padgett negotiated and perhaps arranged for Padgett to purchase Bay Bank for assignment to Union Planters.  First, Miller testified that none of the Christo children advised

---

[31] See Rawlins Dep. at 62, in R5, Tab 85.

[32] See Irene Christo Aff. ¶ 15 ("[Padgett] and my father then went into the next room alone for the purpose of discussing the changes in the side deal between Defendant Padgett and the Christo family. . . ."), ¶ 16 ("[Christo, Jr.] said that Defendant Padgett would bid on the Bay Bank stock and then assign the bid to Union Planters or to another purchaser."), in R6, Tab 89; Wood Aff. ¶ 9 ("[Padgett] and [Christo, Jr.] then went into the next room alone for the purpose of discussing the changes in the side deal between Defendant Padgett and the Christo family. . . ."), ¶ 10 ("[Christo, Jr.] said that Defendant Padgett would bid on the Bay Bank stock and then assign the bid to Union Planters or to another purchaser."), in R6, Tab 89; Hilton Aff. ¶ 5 ("It was clearly inferred that Padgett had decided not to sell the bank to a third party (pursuant to what I understood was his prior agreement with the Christo family), but rather to compensate the Christo family in cash for their equity in Bay Bank); Rawlins Dep. at 73 ("My perception is that Mr. Christo thought there was some sort of agreement between he and Padgett."), 109 ("I got the impression that Mr. Padgett was his own man."), in R5, Tab 85.
There is also documentary evidence of negotiations between Padgett and Union Planters for the Bay Bank Stock, but they do not necessarily reflect that such negotiations were at the behest of Christo, Jr.. See R4, Tab 71, Ex. F.

[33] See Christo, Jr. Dep. at 48-49, 51, 78, 97-98, in R3, Tab 67, Ex. 2.

him of any cause of action they might have had against Padgett.[34]  Second, although Phillip Christo testified that Padgett had agreed to buy Bay Bank on his behalf, he admitted that he relied on his father's word for that opinion.[35] Moreover, throughout his testimony, Phillip Christo refers to the agreement as Padgett and Christo, Jr.'s.[36]  Third, Irene Christo admitted that she had never discussed the agreement with Padgett even though she had successfully sought reimbursement from Padgett for her portion of the $250,000 auction payment.[37] And although Irene Christo testified "I just know in my heart for him [sic] to get the bank at 8.5 million and for the deal that he had with my father to assign the stock over, that he didn't fulfill his part of the bargain," she conceded that she never made a demand against Padgett.[38]  Finally, Padgett testified that he had never had any discussion with the Chisto children regarding an agreement to purchase

---

[34] See Tr. of June 30, 1998 Hr'g at 16, in R11 ("[O]ne of th[e Christo children] made mention that there was a deal between Mr. Christo and Mr. Padgett for Mr. Padgett to go and bid on behalf of Mr. Christo."); 21 ("From the testimony we had gotten before we filed suit all evidence pointed if [sic] there was an agreement it was Mr. Christo's agreement with Mr. Padgett . . . .").

[35] See id. at 138-39, 140.

[36] See id. at 160 ("[T]here was an agreement between [Padgett] and dad"); 149 ("I felt like that [sic] Mr. Padgett would honor his agreement with my dad . . . .").

[37] See id. at108-09.

[38] Id. at 110.

Bay Bank on their behalf.[39]

Reviewing this record, there is simply no evidence that was ever an agreement between Padgett and anyone other than Christo, Jr. himself.[40] Even though the Christo children would obviously have benefitted financially from Padgett's sale of Bay Bank to Union Planters, this, without more, does not confer on them the right to pursue a cause of action for breach of contract against Padgett. Because any cause of action would have belonged solely to Christo, Jr., that cause of action became property of the estate when he filed his petition for bankruptcy. See 11 U.S.C. § 541(a)(1) (2000); Meehan v. Wallace (In re Meehan), 102 F.3d 1209, 1210 (11th Cir. 1997). Christo, Jr. stood silently by when the Trustee filed suit against Padgett for breach of contract, and then sought to assert the same claims after the Trustee voluntarily dismissed them.[41] This he may not do.

Christo, Jr. nevertheless contends that the district court should not have

_____

[39] See id. at 79.

[40] See also note 33, supra.

[41] Christo, Jr. emphasizes that Miller, deeming the dismissed claims worthless, abandoned them and that, because the claims had been dismissed without prejudice, that Christo, Jr. was later free to pursue those abandoned claims. At Padgett's request, Miller filed a notice seeking to abandon his earlier dismissed claims against Padgett, see Notice of Intent to Abandon Counts III and IV of Lawsuit, in R3, Tab 67, Ex. 12, but after Padgett's objection, filed an amended notice in which Miller explained that Christo, Jr. could not pursue the dismissed claims because the dismissal had resolved those claims or because Christo, Jr. was barred by the automatic stay, see Trustee's Amendment and Clarification of His Notice of Abandonment Dated January 15, 1998, at 4-5, in R3, Tab 67, Ex. 13.

26

weighed the evidence when there was an outstanding motion for summary judgment and demand for a jury trial in the Christo litigation. The district court made the contested factual findings in the Miller litigation, however, litigation in which the Christos never attempted to intervene. The judge ordered a hearing on the issues underlying both the Miller and Christo litigations and invited all interested parties to present evidence.[42] The district court's factual findings, made in the Miller litigation, were not clearly erroneous. In any event, summary judgment would have been appropriate on the Christos' claims in light of the dearth of evidence that anyone other than Christo, Jr. would have had a viable claim against Padgett.

D. Motion to Dismiss

In its July 13, 1998, order, the district court made preliminary findings that no agreement existed between Christo, Jr. and Padgett regarding the purchase of Bay Bank and that, even if such an agreement had existed, Christo, Jr. acted solely on his own behalf and therefore any claim of his against Padgett became the property of his bankruptcy estate.[43] Based on these findings, the district court later dismissed the Christos' breach of contract suit against Padgett on the grounds of

---

[42] See Order, June 15, 1998, at 2, in R7, Tab 11.

[43] See Order, July 13, 1998, at 3-4, in R7, Tab 14.

issue preclusion. In the alternative, the court determined that summary judgment would be appropriate.

The Christos argue that the July 13 order cannot have preclusive effect because it was not a final judgment. Technically, the Christos' assessment of the July 13 order is correct. The order's introductory paragraph reads in part, "[t]he Court now makes *preliminary* findings on issues which are conditions to the proposed settlement . . . ."[44] The Christos, emphasizing the need for finality, contend a judgment is final only when appealable under 28 U.S.C. § 1291. The only cases cited by the Christos defining the finality requirement for preclusion, however, involve *claim* preclusion. See In re Justice Oaks II, Ltd., 898 F.2d at 1549-50; First Ala. Bank of Montgomery, N.A. v. Parsons Steel, Inc., 825 F.2d 1475, 1481 (11th Cir. 1987).[45] This case, by contrast, involves *issue* preclusion; the court stated that all the facts and questions essential for the Christos' breach of contract claims were decided in the July 13 Order.[46]

---

[44] Order, July 13, 1998, at 1, in R7, Tab 14 (emphasis added).

[45] The First Alabama Bank court's observation that "[n]onappealable final orders are not entitled to collateral estoppel or res judicata effect," see 825 F.2d at 1481 n.5, is dicta because the decision involved only claim preclusion. See also Gresham Park Comm. Org. v. Howell, 652 F.2d 1227, 1243 (5th Cir. Unit B 1981) (applying Lummus standard of relaxed finality for issue versus claim preclusion), overruled on other grounds, Wood v. Orange County, 715 F.2d 1543, 1546 (11th Cir. 1983).

[46] The In re Justice Oaks II court summarized these concepts succinctly:

It is widely recognized that the finality requirement is less stringent for issue preclusion than for claim preclusion. See Miller Brewing Co. v. Jos. Schlitz Brewing Co., 605 F.2d 990, 996 (7th Cir. 1979); Lummus Co. v. Commonwealth Oil Refining Co., 297 F.2d 80, 89 (2d Cir. 1961); Restatement (Second) Judgments § 13 (1980); 18 Charles Alan Wright et al., Federal Practice and Procedure § 4434 at 321 (1981 & Supp. 2000).[47] The July 13 order satisfied this limited standard for finality. The court considered a wide range of evidence from all concerned parties and wrote a substantial order in which it explained its findings. Moreover, the court put the parties on notice that the order could have preclusive effect,[48] and it is

> Res judicata is frequently used to refer generically to the law of former adjudication. . . . If the later litigation arises from the same cause of action, then the judgment bars litigation not only of every matter which was actually offered and received to sustain the demand, but also of every claim which might have been presented. In this opinion, we refer to this strand of former adjudication as "claim preclusion." If, however, the subsequent litigation arises from a different cause of action, the prior judgment bars litigation only of those matters or issues common to both actions which were either expressly or by necessary implication adjudicated in the first. We refer to this strand of former adjudication as "issue preclusion."

898 F.2d at 1549-50 n.3 (internal quotation marks and citations omitted).

[47] "The rules of res judicata are applicable only when a final judgment is rendered. However, for purposes of issue preclusion (as distinguished from merger and bar), 'final judgment' includes any prior adjudication of an issue in another action that is determined to be sufficiently firm to be accorded conclusive effect." Restatement (Second) Judgments § 13. Comment g adds criteria for determining whether a decision was "adequately deliberated and firm" or "avowedly tentative," including whether the parties were fully heard.

[48] See Order, June 15, 1998, at 2, in R7, Tab 11 (ordering June 30,1998 hearing and making clear that "this proceeding could result in an order granting the motion to approve settlement, and, ultimately, preclusion of any parties from pursuing claims against Kenneth Earl Padgett

clear that both the district and bankruptcy courts considered those findings final.

Even if the Christos were technically correct that the July 13 order has no

preclusive effect, their argument is ultimately one of form rather than substance.

Three weeks after dismissing the Christos' lawsuit, the district court entered a final

order approving the proposed settlement in the Miller litigation.

In the alternative, the Christos claim that even the final order approving the

settlement has no preclusive effect. The Christos cite In re Justice Oaks II, 898

F.2d at 1549 for this proposition. In re Justice Oaks II, however, stands for the

simple proposition that a bankruptcy court's assessment of the claims underlying a

proposed settlement do not constitute a final judgment on the merits of those

claims. See id. ("[A] bankruptcy court's order authorizing settlement of a claim

cannot constitute a final judgment on the merits for purposes of former

adjudication."). Here, in contrast, the district court made factual findings, after

hearing extensive evidence, that were binding on the bankruptcy court's

consideration whether the approve the proposed settlement.

This court has articulated the following standard for issue preclusion:

To claim the benefit of collateral estoppel the party relying on the
doctrine must show that: (1) the issue at stake is identical to the one

_____

regarding his purchase of Bay Bank and Trust Company and/or his failure to assign any interests
therein.").

30

involved in the prior proceeding; (2) the issue was actually litigated in the prior proceeding; (3) the determination of the issue in the prior litigation must have been "a critical and necessary part" of the judgment in the first action; and (4) the party against whom collateral estoppel is asserted must have had a full and fair opportunity to litigate the issue in the prior proceeding.

Pleming v. Universal-Rundle Corp., 142 F.3d 1354, 1359 (11th Cir. 1998). In determining when an issue has been "actually litigated," the Pleming court cited with approval the Restatement's formulation that "[w]hen an issue is properly raised, by the pleadings or otherwise, and is submitted for determination, and is determined, the issue is actually litigated." Id. (quoting Restatement (Second) of Judgments § 27 cmt. d (1982)).

In this case, all of the elements for issue preclusion have been satisfied: (1) the issues decided after the June 30, 1998, hearing were identical to those asserted in the Christo litigation; (2) those issues were actually litigated on June 30, 1998; (3) determination of those issues was essential to the court's judgment in the Miller litigation; (4) and the Christos had a full and fair opportunity to present their evidence on the issues. See Pleming, 142 F.3d at 1359. The district court correctly dismissed the Christos' claims on the ground of issue preclusion.[49] In the

---

[49] The Christos' argument that a finding of issue preclusion denied them the right to have a jury hear their claims against Padgett is unavailing. "The determination of an issue by a judge in a proceeding conducted without a jury is conclusive in a subsequent action whether or not there would have been a right to a jury in that subsequent action if collateral estoppel did not apply." Restatement (Second) Judgments § 27 cmt. d (1982).

31

alternative, the district court properly granted summary judgment to Padgett based on the lack of evidence of an agreement between Padgett and any of the Christo children.

## III.  CONCLUSION

We lack jurisdiction to review the district court's decision not to remand the Christo litigation to the state court whence it came; we AFFIRM the district court in denying the motion to recuse, in approving the proposed settlement in the Miller litigation, and in dismissing the claims in the Christo litigation on the ground of issue preclusion.