FLORIDA TRANSPORTATION
SERVICE, INC., Plaintiff

v.

MIAMI–DADE COUNTY, Defendant.

Case No. 05–22637–CIV.

United States District Court,
S.D. Florida.
Miami Division.

April 7, 2008.

Jeffrey B. Crockett, Esq., Mark A. Journey, Esq., Coffey Burlington Wright Crockett, et al., Miami, FL, for Plaintiff.

Craig E. Leen, Esq., Steven B. Bass, Esq., Miami–Dade County Attorney's Office, Miami, FL, for Defendant.

**ORDER ON MOTIONS FOR SUMMARY JUDGMENT**

ADALBERTO JORDAN, District Judge.

Florida Transportation has sued Miami–Dade County under 42 U.S.C. § 1983 for violations of the dormant Commerce Clause based on how stevedore permits are issued for the Port of Miami. Pending are Florida Transportation's motion for summary judgment on liability [D.E. 107] and the County's cross motion for final summary judgment [D.E. 146]. For the reasons stated below, summary judgment on liability is entered in favor of Florida Transportation for the claims based on the denial of stevedore permits in 2003, 2004, and 2005. Summary judgment is entered in favor of the County as to all other claims.

### I. BACKGROUND

This dispute arises out of the enforcement of a County ordinance requiring a special permit for stevedores working in the County-owned Port of Miami. The following facts are based on the parties' joint stipulation of facts [D.E. 169] and the undisputed record.

### A. COUNTY ORDINANCE § 28A–6

A stevedore loads and unloads cargo in a port [D.E. 169 at ¶ 10]. As a general matter, § 28A–6 of the Miami–Dade County Code governs the issuance of stevedore licenses and permits in the County. A stevedore license is sufficient to perform work anywhere in the County, except in the Port of Miami.

To work in the Port of Miami, a stevedore needs a permit issued by the port director. As is relevant here, § 28A–4(b) requires that the port director, "in making his determination as to the issuance or denial of the permit, shall [in addition to other factors identified in the ordinance] make findings as to the need or lack of need for such permit." A number of additional factors to be considered before a permit is issued, in addition to the "needs determination," are set forth in § 28A–6.4(c). One of these additional factors is "the inability or refusal of license or present permit holders, respectively, to adequately serve new or existing business." See § 28A–6.4(c)(5).

The stevedore permits for the Port of Miami expire on January "fifteenth annually." See § 28–A–6.6. Upon expiration, a permit may be renewed by the port director when all the applicable requirements and procedures set forth in "[§§ ] 28A–6.1 through 28A–6.8 [and other applicable requirements] ... have been met." See id.

### B. THE PORT OF MIAMI CARGO TERMINALS

The Port of Miami competes with other ports in the United States and Latin America [D.E. 169 at ¶ 19]. The Port has invested millions of dollars on land, equipment, and facility development to attract cruise and cargo traffic [Id. at ¶ 20].

Until 1994, the Port had several small cargo terminals competing for its cargo business. To improve the Port's cargo capacity and increase capital investment, the Board of County Commissioners approved the formation of POMTOC—a combination of small cargo terminal operators. Since the formation of POMTOC, the

Port's cargo capacity has significantly increased [*Id.* at ¶¶ 21–22]. POMTOC now operates one of the Port's three main cargo terminals. The other two main cargo terminals are used almost exclusively by two carriers, Maersk and Seaboard Marine [*Id.* at ¶ 18].

As of June of 2002—the date of the last need assessment of record—there were nine stevedore companies permitted to operate at the Port of Miami:

1. Biscayne Stevedoring
2. Eller–ITO Stevedoring Company
3. Florida Stevedoring, Inc.
4. Hallmark Stevedoring Company
5. Oceanic Stevedoring Company
6. P & O Ports of Florida, Inc.
7. R.O. White & Company, Inc.
8. Seaboard Marine, Ltd.
9. Universal Maritime Services

[D.E. 96–31].

A number of the permitted stevedore companies are owned by or are affiliated with the Port's cargo carriers. For example, Universal Stevedoring is wholly owned by Maersk [*Id.* at 3]; Eller–ITO is owned by two of the current owners of POMTOC; and Florida Stevedoring is an owner of POMTOC [D.E. 169 at ¶ 23].

### C. FLORIDA TRANSPORTATION AND ITS PERMIT APPLICATIONS

Florida Transportation is a stevedore company based in Broward County. It provides stevedore services at Port Everglades in Fort Lauderdale. Florida Transportation is also a cruise stevedore for the Disney cruise lines at Port Canaveral [*Id.* at ¶¶ 1, 2, 4].

Florida Transportation's president, John Gorman, Jr., has had a stevedore license in Miami–Dade County since 1979 [*Id.* at ¶ 13]. Neither Mr. Gorman nor Florida Transportation, however, has a stevedore permit to work at the Port of Miami.

### 1. THE JUNE 30, 1999, PERMIT APPLICATION

Florida Transportation applied for a stevedore permit on June 30, 1999. On July 1, 1999, a former port employee granted the permit application, erroneously assuming that he was reviewing an application for renewal. Once the error was discovered, the port director sent a letter to Florida Transportation holding the permit in abeyance [D.E. 108,144 at ¶¶ 11–12].

On July 12, 1999, Florida Transportation sued the County and the port director in state court, seeking reinstatement of its stevedore permit [D.E. 144 at ¶ 16]. This lawsuit was dismissed with prejudice because Florida Transportation had not first appealed to the Board of County Commissioners. The dismissal was affirmed on appeal [*Id.* at ¶ 16].

On August 12, 1999, the port director sent a letter to Florida Transportation denying its June 1999 application. The stated reason for the denial was that there was no need for an additional stevedore company at the time and that Florida Transportation was not competent to work at the Port [*Id.* at ¶ 17].

### 2. THE JANUARY 14, 2000, PERMIT APPLICATION

On January 14, 2000, Florida Transportation filed another application for a stevedore permit. The port director denied the application on March 1, 2000 [D.E. 169 at ¶ 37]. Citing the August 1999 need assessment report, he explained that "(as has been the case for a number of years) there is no need for additional stevedore permits at the seaport at this time" [D.E. 133–2 at 1].

Florida Transportation filed a petition in state court for a writ of certiorari, alleging that the denial of its permit application violated the U.S. and Florida constitutions [D.E. 104–15 at 24]. The state trial court

denied Florida Transportation's petition for certiorari, and the state appellate court affirmed [D.E. 169 at ¶ 37].

### 3. THE JANUARY 8, 2001, PERMIT APPLICATION

On January 8, 2001, Florida Transportation again applied for a permit. The port director denied this application on June 11, 2001, stating that there had been "no significant change at the Port of Miami with respect to the need for additional stevedores to adequately service the lines calling at Miami" [D.E. 104-20]. Florida Transportation appealed the denial to the Board of County Commissioners, but the denial was affirmed upon the recommendation of the County Manager [D.E. 169 at ¶ 38; D.E. 104-21].

### 4. THE JANUARY 24, 2002, PERMIT APPLICATION

On January 24, 2002, Florida Transportation filed yet another application. This time the application was denied based on a 2002 need assessment, which found that there was no need for new stevedores at the Port [D.E. 96-31]. Pursuant to a new review procedure, Florida Transportation appealed the denial of its application to an administrative examiner and not to the Board of County Commissioners. In its appeal, Florida Transportation argued, among other things, that the stevedore permit ordinance was invalid under the Florida Constitution [D.E. 106-2 at 3]. The administrative examiner held a three-day evidentiary hearing, at which Florida Transportation was allowed to present witnesses and documentary evidence in support of its position, cross-examine any witnesses offered by the County, and provide argument from counsel [D.E. 105-106]. After the evidentiary hearing, the County's administrative examiner affirmed the denial of the stevedore permit. Among other things, the administrative examiner found that "no need analysis is done" for renewal applications, and that "once a permit has been issued it will continue to be issued unless and until just cause exists for non-issuance of the permit" [D.E. 106-2 at 13]. Florida Transportation did not appeal the administrative examiner's decision [D.E. 169 at ¶ 39].[1]

### 5. THE 2003, 2004, AND 2005, PERMIT APPLICATIONS

Florida Transportation applied for permits again in 2003, 2004, and 2005. The port director denied these applications, and Florida Transportation did not appeal these denials [*Id.* at ¶¶ 41-43].

### D. OUT-OF-STATE PERMIT APPLICATIONS

In the last ten years, the port director has not denied any stevedore permit application filed by an out-of-state applicant [D.E. 169 at ¶ 47]. Seaboard Marine—which is owned by Seaboard Ltd., a Kansas corporation—was the last, and only out-of-state stevedore to receive a stevedore permit in the last ten years [D.E. 131-2 (Aff. of Ray Mauri) at ¶ 10]. The record is silent as to when Seaboard Marine obtained its permit, but it was prior to June of 2002 [D.E. 96-31].

### E. THIS LAWSUIT

Florida Transportation filed this action in October of 2005 against the County and the port director. In its one-count complaint, Florida Transportation alleges that the County's permit ordinance violates the dormant Commerce Clause. Florida Transportation seeks declaratory relief, permanent injunctive relief, and damages under 42 U.S.C. § 1983.

On February 16, 2005, Florida Transportation voluntarily dismissed, with preju-

---

1. Florida Transportation filed a second application in 2002. This second application was denied because a party is allowed to file only one application per year [D.E. 169 at ¶ 40]. Florida Transportation does not challenge the denial of its second application in 2002.

dice, its claims against the port director [D.E. 21].

## II. LEGAL STANDARD

The summary judgment standard is well settled. A motion for summary judgment should be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Where the non-moving party fails to prove an essential element of its case for which it has the burden of proof at trial, summary judgment is warranted. *See id.* at 323, 106 S.Ct. 2548. That is, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting *First Nat'l Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253, 289, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968)). In making this assessment, the court "must view all the evidence and all factual inferences reasonably drawn from the evidence in the light most favorable to the nonmoving party," and "resolve all reasonable doubts about the facts in favor of the nonmovant." *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1285 (11th Cir.1997).

## III. ANALYSIS

Before considering the merits of Florida Transportation's Commerce Clause claims, I need to determine whether, as argued by the County, any of these claims are barred by the statute of limitations or the doctrines of res judicata or collateral estoppel.

### A. STATUTE OF LIMITATIONS

Florida Transportation's § 1983 claims for violations occurring prior to October 3, 2001, are barred by the statute of limitations.

The statute of limitations for Florida Transportation's claims under § 1983 is four years, borrowing the Florida residual personal injury statute of limitations. *See City of Hialeah v. Rojas*, 311 F.3d 1096, 1103 n. 2 (11th Cir.2002); *Rozar v. Mullis*, 85 F.3d 556, 561 (11th Cir.1996). The limitations period does not begin to run until the facts that would support a cause of action are apparent or should be apparent to a reasonably prudent person. *See Mullis*, 85 F.3d at 561–62.

Florida Transportation filed this action on October 3, 2005, seeking damages for the denial of stevedore permits every year from 1999 to 2005. I conclude that Florida Transportation's claims accrued at the time each permit was denied. The denial of each permit made or should have made apparent to Florida Transportation that its Commerce Clause rights had been violated. Accordingly, Florida Transportation's claims for damages arising from the denial of stevedore permits prior to October 3, 2001—more than four years before the filing of this action—are barred by the statute of limitations.

I reject Florida Transportation's contention that the accrual of the claims was delayed under the continuing violation doctrine. Under the continuing violation doctrine, a constitutional violation outside the limitations period is not time barred if it is caused by a continuing discriminatory policy. *See, e.g., Bendik v. Credit Suisse First Boston (USA), Inc.*, 2004 WL 736852, *6 (S.D.N.Y. Apr. 5, 2004). The Supreme Court has made clear, however, that the continuing violation doctrine does not apply where each alleged constitutional violation is an independent discrete act. *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 112, 122 S.Ct. 2061, 153

L.Ed.2d 106 (2002) (internal citations omitted). As such, "discrete acts that fall within the statutory time period do not make timely acts that fall outside the time period." *Id. See also Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 766 (2d Cir. 1998) (continuing violation doctrine does not apply where violations are not continuous in time with one another).

■ Florida Transportation's alleged damages arise out of distinct and separate denials of distinct and separate applications for stevedore permits. Each application was considered on its merits and denied at different times for different reasons. On these facts, each permit denial triggered an independent discrete claim. Accordingly, the continuing violation doctrine cannot make the pre-October 3, 2001, claims timely. These claims are barred by the four-year limitations period.

## B. RES JUDICATA AND COLLATERAL ESTOPPEL

Florida Transportation's claim for damages arising out of the denial of the January 2002 application is barred by the doctrine of res judicata.[2]

■ Where a prior state judgment or final decision is concerned, federal courts rely on state law to determine whether an action is barred under the doctrine of res judicata (or claim preclusion). *See Kizzire v. Baptist Health Sys., Inc.*, 441 F.3d 1306, 1308 (11th Cir.2006). Under Florida law, a judgment on the merits rendered in a former suit between the same parties on the same cause of action bars the re-litigation of every claim which was or could have been litigated in that action. *See Fla. Dep't of Transp. v. Juliano*, 801 So.2d 101, 105 (Fla.2001). For res judicata to apply, there must be (1) an identity of the "thing" sued for; (2) an identity of the cause of action; (3) an identity of the parties to the action; and (4) an identity of the quality or capacity of the persons for or against which the claim is made. *See, e.g., Tyson v. Viacom, Inc.*, 890 So.2d 1205, 1209 (Fla. 4th DCA 2005).

■ Florida courts apply res judicata to final decisions of administrative and municipal bodies with "great caution." *See Thomson v. Dep't of Envtl. Regulation*, 511 So.2d 989, 991 (Fla.1987). *See also M.C.G. v. Hillsborough County Sch. Bd.*, 927 So.2d 224, 227 (Fla. 2d DCA 2006); *Miller v. Booth*, 702 So.2d 290, 291 (Fla. 3d DCA 1997). For example, § 83(2) of the Restatement (Second) of Judgments (1982), which was cited with approval in *M.C.G.*, 927 So.2d at 227, provides that an administrative ruling should be given preclusive effect when the administrative proceeding affords the essential elements of adjudication: (1) adequate notice; (2) the right to present evidence and legal argument; (3) a formulation of issues of law and fact for the application of rules to specified parties concerning a specific transaction, situation, or status; (4) a rule of finality, specifying a point when presentations are terminated and a final decision is rendered; and (5) other procedural elements as may be necessary to make the proceeding a sufficient means of conclusively determining the matter in question.

■ All the res judicata requirements are satisfied as to the administrative order affirming the denial of the January, 2002 application. The general requirements of res judicata are satisfied, as the administrative findings constituted a final decision on the merits. Florida Transportation's failure to appeal, moreover, does

---

2. The County argues that the dismissal of Florida Transportation's state court actions filed in July of 1999 and January of 2000 also have res judicata effect. I need not address this argument, as I conclude that Florida Transportation's claims arising from the permit denials in 1999 and 2000 are time-barred.

not diminish the preclusive effect given to the administrative findings. *See M.C.G.*, 927 So.2d at 227 (giving preclusive effect to administrative order that was not appealed because "a determination that has become final in a prior case will be given preclusive effect even if it has not been subjected to appellate review"). Furthermore, Florida Transportation *could have* asserted its constitutional claims in the County administrative proceedings. The findings of the hearing examiner make clear that Florida Transportation was able to raise constitutional challenges to the permit ordinance. Indeed, Florida Transportation argued at the administrative hearing that the ordinance violated the Florida Constitution [D.E. 106–2 at 3]. Florida Transportation could have raised its federal Commerce Clause challenges to the ordinance in the same way that it asserted its state constitutional law challenges.

Similarly, the specific requirements for the application of res judicata are also satisfied as to the administrative examiner's order. Florida Transportation had adequate notice, as demonstrated by the fact that it had sufficient time to subpoena witnesses [D.E. 105, 7–16]. It also had the opportunity to present evidence and legal argument in a three-day evidentiary hearing. [*Id.*]. The hearing culminated in a 15–page opinion by the examiner applying his conclusions of law to the facts of the case [D.E. 106–2]. And after reviewing the hearing transcript, I am convinced that the hearing was a proper forum to conclusively determine and adjudicate Florida Transportation's claims. Accordingly, any claim for damages arising out of the denial of the January, 2002, application is barred by res judicata.

The order affirming the denial of the January 2002 application, however, has no res judicata effect on Florida Transportation's claims for the denial of permits in

2003, 2004, and 2005. As Florida Transportation correctly points out, and as I have already concluded with respect to the statute of limitations, each application denial gave rise to a new and distinct cause of action. *See M.C.G.*, 927 So.2d at 227 ("The doctrine of res judicata—which requires that the second suit present the identical cause of action as was previously litigated—is not applicable where the claims in the two cases concern different periods of time."). As such, there is no identity of cause of action between the administrative order affirming the denial of the January 2002 application and the claims based on the permit denials in 2003, 2004, and 2005.

The administrative examiner's specific legal and factual findings, however, may have preclusive effect under the doctrine of collateral estoppel. Under Florida law, the doctrine of collateral estoppel (or issue preclusion) bars the re-litigation of any issue that has been decided in another action. *See M.C.G.*, 927 So.2d at 226. *See also Christo v. Padgett*, 223 F.3d 1324, 1339 (11th Cir.2000). The doctrine applies where (1) the issue at stake is identical to the one involved in the prior proceeding; (2) the issue was actually litigated in the prior proceeding; (3) the determination of the issue in the prior litigation was a critical and necessary part of the judgment in the first action; and (4) the party against whom collateral estoppel is asserted had a full and fair opportunity to litigate the issue in the prior proceeding. *See id.*

Whether the stevedore permit ordinance violates the dormant Commerce Clause was not "actually litigated" at the administrative hearing. Nevertheless, in addressing Florida Transportation's claim that the port director had abused his discretion under the ordinance, the administrative examiner concluded that "no need analysis is done for renewal applications"

[D.E. 106–2 at 13]. He further found that "the simple conclusion to be derived from the disparity between the treatment of renewal applications and the treatment afforded [to Florida Transportation] is that once a permit has been issued, it will continue to be issued unless and until just cause exists for non-issuance of the permit" [*Id.*]. In other words, the administrative examiner found that current permit holders are, in practice, exempted from § 28A–6.4(b)'s need assessment requirement. This finding as to how the permit ordinance is applied is binding on Florida Transportation and the County in this action and frames, in part, my analysis of Florida Transportation's dormant Commerce Clause claims.

I now turn to the merits of the claims for the permit denials in 2003, 2004, and 2005.

### C. COMMERCE CLAUSE CLAIM

Florida Transportation is entitled to summary judgment on liability as to its claims for the denial of stevedore permits in 2003, 2004, and 2005, because the permit ordinance, as applied, violates the dormant Commerce Clause.

 The Commerce Clause grants Congress the power to regulate commerce among the states. *See* U.S. Const. Art. 1, § 8, cl. 3; *S. Waste Sys., LLC v. City of Delray Beach*, 420 F.3d 1288, 1290 (11th Cir.2005). This power "presumes a national market free from local legislation that discriminates in favor of local interests." *C & A Carbone, Inc. v. Town of Clarkstown*, 511 U.S. 383, 393, 114 S.Ct. 1677, 128 L.Ed.2d 399 (1994). The Commerce Clause is, therefore, not only an authorization for congressional action, but also a restriction on local regulation of interstate commerce. *See Hughes v. Oklahoma*, 441 U.S. 322, 326, 99 S.Ct. 1727, 60 L.Ed.2d 250 (1979). To that effect, the Commerce Clause has been deemed to include an implied "negative command" that prevents

a state or municipality from " 'jeopardizing the welfare of the Nation as a whole' by 'plac[ing] burdens on the flow of commerce across its borders that commerce wholly within those borders would not bear.' " *See American Trucking Ass'n, Inc. v. Michigan Pub. Serv. Com'n*, 545 U.S. 429, 433, 125 S.Ct. 2419, 162 L.Ed.2d 407 (2005) (internal citations omitted). This restrictive aspect of the Commerce Clause is known as the dormant Commerce Clause. *See id.*

### 1. THE APPROPRIATE STANDARD OF REVIEW

 The Supreme Court has adopted a two-tiered approach to determine whether a local regulation violates the dormant Commerce Clause. A local regulation that discriminates against interstate commerce on its face or in practical effect is unconstitutional unless the municipality can establish that it has no other means to advance a legitimate local interest. *See Brown–Forman Distillers Corp. v. New York State Liquor Auth.*, 476 U.S. 573, 578–79, 106 S.Ct. 2080, 90 L.Ed.2d 552 (1986). *See also Carbone*, 511 U.S. at 392, 114 S.Ct. 1677; *New Energy Co. of Ind. v. Limbach*, 486 U.S. 269, 274, 108 S.Ct. 1803, 100 L.Ed.2d 302 (1988). The plaintiff bears the initial burden to show discrimination, and upon a showing of discrimination, the burden shifts to the government to justify the discriminatory law. *See Island Silver & Spice, Inc. v. Islamorada*, 475 F.Supp.2d 1281, 1289 (S.D.Fla.2007) (internal citations omitted). Discrimination, in this context, "means differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." *Oregon Waste Sys., Inc. v. Dep't of Envtl. Quality of Oregon*, 511 U.S. 93, 99, 114 S.Ct. 1345, 128 L.Ed.2d 13 (1994). If the plaintiff cannot establish discrimination, then it must demonstrate that the facially nondiscriminatory regulation's burden on interstate commerce "clearly exceeds" the puta-

tive local benefits. *See Brown–Forman,* 476 U.S. at 578–79, 106 S.Ct. 2080 (*citing Pike v. Bruce Church, Inc.,* 397 U.S. 137, 142, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970)). *See also Carbone,* 511 U.S. at 390, 114 S.Ct. 1677; *Town of Southold v. Town of E. Hampton,* 477 F.3d 38, 47 (2d Cir.2007). Accordingly, "the first step in analyzing any law subject to judicial scrutiny under the negative Commerce Clause is to determine whether it 'regulates evenhandedly with only 'incidental' effects on interstate commerce, or discriminates against interstate commerce.'" *Oregon Waste,* 511 U.S. at 99, 114 S.Ct. 1345.

There is no "clear line" between local laws that discriminate against interstate commerce (and are subject to strict scrutiny) and local laws that impose an indirect burden on commerce (and are subject to the undue burden test). *See Brown–Forman,* 476 U.S. at 579, 106 S.Ct. 2080. *See also Island Silver,* 475 F.Supp.2d at 1290. The distinction is even more blurry when the local law in question favors a mixed group of in-state and out-of-state companies to the detriment of all other competitors—including in-state and out-of-state competitors. The County's stevedore permit ordinance falls in this nebulous area; it protects a group of primarily (but not exclusively) local companies and excludes all other competitors.

In *Carbone,* the Supreme Court held that a local ordinance which protected a local company from in-state and out-of-state competitors was discriminatory (and thus subject to strict scrutiny). The ordinance in *Carbone* required all recycling plants in the town to transfer their solid waste to the preferred local transfer station. A local recycling plant challenged the ordinance in state court, arguing that it discriminated against interstate commerce. The trial court entered summary

judgment against the local plant, and the New York court of appeals affirmed, holding that the ordinance was not discriminatory because it applied "evenhandedly ... regardless of point of origin." *See* 182 A.D.2d 213, 587 N.Y.S.2d 681, 686 (N.Y. 1992). The Supreme Court granted certiorari and reversed. The Supreme Court reasoned that local laws that "hoard a local resource ... for the benefit of local businesses" are discriminatory. *Carbone,* 511 U.S. at 392, 114 S.Ct. 1677. The waste ordinance fell under that category because it "squelches competition in the waste-processing service altogether, *leaving no room for investment from outside.*" *See id.* (emphasis added).

Justice O'Connor's concurring opinion in *Carbone* sheds some light on the debate about how discrimination is defined under the dormant Commerce Clause. Justice O'Connor would have reviewed the waste ordinance under the undue burden test: "Because in-town processors-like petitioners-and out-of-town processors are treated equally, I cannot agree that [the ordinance] 'discriminates against interstate commerce.' Rather [the ordinance] discriminates evenhandedly against all potential participants in the waste processing business, while benefitting only the chosen operator of the transfer facility." *Id.* at 404, 114 S.Ct. 1677 (O'Connor, J., concurring). The majority in *Carbone* implicitly rejected Justice O'Connor's more narrow definition of discrimination and concluded that the ordinance was "no less discriminatory because in-state or in-town processors are also covered by the prohibition." *See id.* at 384, 114 S.Ct. 1677. The Supreme Court reiterated that a local law which blocks all out-of-state investments or participants in favor of a local company is discriminatory, even if it affects other local firms as well. *See id.*[3]

---

**3.** The Supreme Court limited *Carbone* in *United Haulers Ass'n, Inc. v. Oneida–Herkimer Sol-* *id Waste Mgmt. Auth.,* —— U.S. ——, 127 S.Ct.

■ *Carbone* thus stands for the proposition that a local law benefitting a local company and excluding all out-of-state and all other in-state companies discriminates against interstate commerce. *Carbone* suggests that as long as *all* out-of-state companies are excluded or affected and at least one local company is favored, there is discrimination against interstate commerce, triggering strict scrutiny. The basis for a finding of discrimination is that such laws leave "no room for investment from outside." *See id.* at 392, 114 S.Ct. 1677. Whether the holding of *Carbone* applies to a local ordinance that excludes *most*, but not *all*, out-of-state companies is unsettled.

In *Walgreen Co. v. Rullan*, 405 F.3d 50, 53 (1st Cir.2005), the First Circuit considered the constitutionality of a Puerto Rico statute protecting established pharmacies (approximately 8% of which were owned by out-of-state companies) from new competition. The statute required prospective new pharmacies to obtain a certificate of necessity from the health department to operate in the commonwealth. The First Circuit concluded that the statute discriminated against interstate commerce because the health department used the statute to protect "the mostly local group of existing pharmacies from competitive pressure." *See id.* The First Circuit recognized that the statute protected some out-of-state pharmacies which were already operating. But, it noted that the vast majority of favored pharmacies were local concerns and that there was no requirement that "a favored group must be *entirely* in-state for a law to have a discriminatory effect on commerce." *See id.* at 58–59.

■ If the First Circuit's approach is correct, the County's permit ordinance is discriminatory. I, however, do not find the reasoning of *Walgreen* persuasive. A local law which benefits a selected group of in-state and out-of-state companies to the detriment of all other competitors, by definition, does not "discriminate" on the basis of local *vis as vis* out-of-state origin, Unlike the law in *Carbone*, such laws cannot be said to leave "no room for investment from outside." *See Carbone*, 511 U.S. at 391–92, 114 S.Ct. 1677. *See also id.* at 404, 114 S.Ct. 1677 (O'Connor, J. concurring).

■ This conclusion is consistent with *Southern Waste Systems, LLC v. City of Delray Beach*, 420 F.3d 1288 (11th Cir. 2005), where the Eleventh Circuit concluded that an exclusive agreement in favor of an out-of-state company did not violate the dormant Commerce Clause. In *Southern Waste*, the City of Delray Beach, Florida, issued a request for bids to become the City's exclusive provider of waste collection services for a period of five years. Five companies submitted bids, and the City ultimately selected an out-of-state company. The City then enacted an ordinance insulating the successful bidder from competition, and a local competitor sued under the dormant Commerce Clause. The Eleventh Circuit rejected the constitutional claim, noting that the bidding process "was not only open to out-of-state competitors, but it was, in fact, awarded to one." *See id.* at 1291. Contrary to *Walgreen*, therefore, *Southern Waste* suggests that a law which favors out-of-state parties over local firms does not discriminate against interstate commerce so as to trigger strict scrutiny. The

1786, 1795, 167 L.Ed.2d 655 (2007), which held that a local law which favors a *public* company and excludes all other competitors—local and out-of-state—was not discriminatory, and was therefore subject to the un-

due burden test. *See id.* at 1797. *United Haulers*, however, did not affect the holding of *Carbone* with respect to laws favoring private entities. *See id.* at 1793–95.

existence of interstate discrimination does not (and should not) depend on a calculation of the percentage of out-of-state companies benefitted by a local ordinance.

■ That is not to say that non-discriminatory laws insulating a group of primarily local companies from competition do not have a negative impact on interstate commerce. Such laws, though, are best reviewed under the undue burden test, and are not subject to strict scrutiny. *See United Haulers,* 127 S.Ct. at 1797 (nondiscriminatory local laws "which treat instate private business interests exactly the same as out-of-state ones, do not 'discriminate against interstate commerce'" and are subject to the undue burden test). *See also Town of Southold,* 477 F.3d at 49–50 (a local law that does not give an advantage to local companies over out-of-state competitors is reviewed under the undue burden test).

■ Accordingly, I agree with the County that the appropriate standard of review for the stevedore permit ordinance is undue burden and not strict scrutiny. Applying the lowest standard of review here is also appropriate because the stevedore permit ordinance is unconstitutional even under this more forgiving standard. *See, e.g., Medigen of Kentucky v. Pub. Serv. Comm'n of West Virginia,* 985 F.2d 164, 166 (4th Cir.1993) (because ordinance was unconstitutional even under the deferential balancing test, it was "unnecessary to decide whether the requirement should be evaluated under a stricter standard").

2. APPLYING THE UNDUE BURDEN TEST

■ Contrary to the County's argument, the stevedore permit ordinance, as applied, significantly burdens interstate commerce and violates the dormant Commerce Clause. The port director, with the acquiescence of the Board of County Commissioners and the County Manager, has in essence used the ordinance to protect a group of entrenched stevedores and bar the entry of new competitors to the stevedore market. Under this protectionist scheme, new competitors are not allowed as long as the entrenched nine stevedores are willing to serve the need for stevedore services, even if these new competitors could provide the same or expanded services in a more advantageous way.

This entrenchment is perpetuated by the incestuous procedure used to determine the need for new stevedores. For example, in 2002 the port director concluded that there was no need for new stevedore permits. *See* Report on Status of Need of Stevedore Service [D.E. 96–31]. This conclusion was primarily based on a survey of the Port's cargo carriers, all of which generally stated that they were satisfied with the current stevedores. The problem with this survey is that some of these cargo carriers own or are affiliated with permitted stevedores. *See id.* at 3. It is not surprising that these carriers would vouch for the good job of their affiliates; they are protecting their own oligopoly. *Cf. Mercantile Texas Corp. v. Bd. of Governors of Fed. Reserve Sys.,* 638 F.2d 1255, 1267 (5th Cir.1981) (*citing* R. Posner, Antitrust Law: An Economic Perspective 124–25 (1976): "[e]conomic theory suggests that, where oligopoly profits are available, a multitude of firms will eagerly seek to enter the market," but the oligopoly is protected because "[b]arriers to entry ... reduce the number of potential entrants"); Richard A. Posner, Antitrust Law, 74 (2d Ed. 201) ("The principal examples" of barriers to entry protecting oligopolies "involve legal restrictions on entry, for example certificate-of-need laws in the hospital industry, which impose a regulatory barrier to the creation of new hospitals of the expansion of existing ones"). *See also Bailey v. Allgas, Inc.,* 284 F.3d 1237, 1251 (11th Cir.2002) ("[t]he hallmark of an oligopoly is tacit collusion among competitors");

*Bailey v. Allgas, Inc.*, 148 F.Supp.2d 1222, 1242 n. 22 (N.D.Ala.2000) (an oligopoly is often marked by "lack of competition").

The stevedore permit ordinance does provide that permits for current holders are to expire every year and may be renewed only if the applicable requirements have been met. But as the administrative examiner found, this is not how the ordinance is actually applied. Permits for current holders are routinely renewed, and new applications are denied as long as the already-established stevedores can adequately serve the market. The entrenched nine stevedores are not subjected to the need assessment requirement imposed on new comers, despite the text of the ordinance. *See* Findings of Administrative Examiner [D.E. 106–2 at 12].[4]

The administrative examiner's findings as to how the ordinance is applied are confirmed by the issuance and subsequent revocation of a stevedore permit to Florida Transportation in 1999. Florida Transportation's application was initially granted under the erroneous assumption that Florida Transportation was a current permit holder merely seeking renewal. When the error was discovered, the port director revoked the permit and ultimately denied the application because there was no need for new stevedores at the Port. A more vivid example of an ordinance applied to protect entrenched firms is difficult to imagine.[5]

Given the way the permit ordinance has been applied, I conclude that the nine permitted stevedores are entrenched and insulated from any new competition. This is a significant burden on interstate commerce, as the County has in essence removed the stevedore market at the Port of Miami from the national market. Stevedores, other than the entrenched nine, are prevented from offering their services at the Port of Miami. Indeed, to assess the burden that the stevedore permit ordinance places on interstate commerce, one need only assume what would happen if all port-owning municipalities closed off their ports for the benefit of a group of entrenched and primarily local stevedores. *See Healy v. Beer Institute, Inc.*, 491 U.S. 324, 336, 109 S.Ct. 2491, 105 L.Ed.2d 275 (1989) (an ordinance's effect on interstate commerce "must be evaluated not only by considering the consequences of the statute itself, but also by considering ... what effect would arise if not one, but many or every, State adopted similar legislation").

The resulting balkanization of the nation's stevedore market has no place in the free national market guaranteed by the dormant Commerce Clause. As Justice Jackson explained more than 50 years ago, "our system, fostered by the Commerce Clause, is that every farmer and every craftsman shall be encouraged to produce by the certainty that he will have free access to every market in the Nation, that no home embargoes will withhold his exports, and no foreign state will by customs duties or regulations exclude them." *H.P. Hood & Sons, Inc. v. Du Mond*, 336 U.S. 525, 539, 69 S.Ct. 657, 93 L.Ed. 865 (1949). The County cannot remove its port facility from the national stevedore market any more than Texas can remove its oil refineries, or California can block off its wineries, or Michigan can monopolize its auto

---

4. The parties have not contested the administrative examiner's factual findings, which, as noted earlier, have collateral estoppel effect here.

5. Although the 1999 permit denial, as a substantive claim, is time-barred, evidence as to how the ordinance was applied then is still admissible as to the remaining timely claims. *See United States v. Ashdown*, 509 F.2d 793, 798 (5th Cir.1975); *Gaston v. Home Depot*, 129 F.Supp.2d 1355, 1366–67 (S.D.Fla.2001). *See also Sir Speedy, Inc. v. L & P Graphics, Inc.*, 957 F.2d 1033, 1038 (2d Cir.1992).

industry. *See id.* The problem is not that, in the County's view, the Port of Miami can only accommodate a certain number of stevedores. It may be that the Port of Miami has a limited capacity. The problem is that, for a limited number of stevedore slots, current permit holders obtain rubber-stamp renewals, while new prospective entrants do not even get their feet in the door so as to be able to compete for the limited slots. The permit ordinance mandates (and presumes) that current permit holders will have to satisfy the need requirement, but in practice they are exempted from this requirement.

Not surprisingly, local laws insulating established companies from new competition under the guise of a need assessment scheme have been repeatedly found to violate the dormant Commerce Clause. *See, e.g., H.P. Hood & Sons,* 336 U.S. at 545, 69 S.Ct. 657; *Walgreen,* 405 F.3d at 57–60; *Yamaha Motor Corp. v. Jim's Motorcycle, Inc.,* 401 F.3d 560, 570–574 (4th Cir.2005); *Medigen,* 985 F.2d at 167. In *H.P. Hood & Sons,* for example, the Supreme Court reviewed a New York statute protecting established milk producers. The statute provided that a license to operate a milk plant should not be issued unless the commissioner of agriculture determined "that the issuance of the license will not tend to a destructive competition in a market already adequately served." *See* 336 U.S. at 528, 69 S.Ct. 657. In concluding that the ordinance discriminated against interstate commerce, the Court recognized that the plaintiff already operated a milk plant in New York and was seeking the license for a second plant. Nevertheless, the Court reasoned that "while the state power is applied in this case to limit expansion by a handler of milk, who already has been allowed some purchasing facilities, the argument for doing so, if sustained, would be equally effective to exclude an entirely new foreign handler from coming into the state to purchase." *Id.* at 540, 69 S.Ct. 657.

The Court, therefore, held that the statute violated the dormant Commerce Clause. *See id.* at 545, 69 S.Ct. 657.

Similarly, in *Yamaha Motor,* the Fourth Circuit reviewed a Virginia statute that required a need assessment analysis before a new motorcycle dealership could be opened. The statute gave existing dealerships the right to protest the opening of a new dealership in their market. When a protest was filed, the new dealership could open only upon reasonable evidence that the market could support a new dealer. The Fourth Circuit noted that the statute created a significant barrier to market entry because of the "virtual certainty" of a protest whenever a manufacturer attempted to authorize a new dealership. There was also evidence that the possibility of a protest and the required need assessment had deterred new market comers. The Fourth Circuit concluded that the statute failed under the undue burden test because the effect on interstate commerce outweighed the purported state need to prevent market saturation. *See* 401 F.3d at 571. If the statute were upheld, it would give "Virginia the green light to extend similar protection to automobile dealers and franchises of other product lines, thereby turning Virginia into an *island of economic protectionism.*" *See id.* at 573–74 (emphasis added).

The admonishment of the Fourth Circuit in *Yamaha Motor* applies with equal force here. Just like the Virginia statute allowed established motorcycle dealers to block new dealers, the stevedore permit ordinance, as applied, allows established stevedores—through their affiliates' need assessments—to block new competition. To make matters worse, in practice current permit holders are exempted from the required need assessment when they come up for renewal. If the County can limit competition in the stevedore market to a

handful of entrenched privileged companies, then it can also limit competition at locales like the airport, and the County would become "an island of economic protectionism."

 The County argues that the ordinance does not burden commerce because only one out-of-state firm (Seaboard Marine) has applied for a permit within the last ten years, and its application was granted. This argument is not without some merit. In *United Haulers*, for example, the Supreme Court suggested that a local law's "disparate impact on out-of-state as opposed to in-state business" was one of the factors to be considered in the undue burden analysis. *See* 127 S.Ct. at 1797. But the Court did not say that this factor was dispositive. On the contrary, the Court left open the possibility that a non-discriminatory law that removes a local market from the national market could be deemed to burden interstate commerce, irrespective of evidence of disparate impact. *See id.* The Court ultimately did not have to decide the issue, because it found that the benefits of the ordinance insulating a group of *government-owned* waste processing companies from competition outweighed any arguable burden on interstate commerce. *See id.*

That is not the case here. Unlike the ordinance considered in *United Haulers*, the stevedore permit ordinance protects nine privileged *private* stevedores, not County-owned companies. More importantly, the County has failed to present any public interest warranting the seemingly permanent removal of the Port of Miami's stevedoring market from the national market. *See also Brimmer v. Rebman*, 138 U.S. 78, 83, 11 S.Ct. 213, 34 L.Ed. 862 (1891) ("a burden imposed by a state upon interstate commerce is not to be sustained simply because the statute imposing it applies alike to ... the people of the State enacting such statute").

 The County nevertheless asserts that the denial of Florida Transportation's permit applications are justified by "seven years of ... findings and determinations as to what the proper number of Port stevedore permit holders should be given the Port's demand for stevedoring services, the existing capacity to meet the demand, the amount of available Port land, and the overall efficiency of Port operations as determined by the then Port Director." *See* County Mem. [D.E. 148] at 13. This argument does not come even close to justifying the removal of the Port of Miami's stevedore market from the national market. As noted earlier, the practice that places an undue burden on interstate commerce is not the decision to limit the number of permitted stevedores to nine, but the decision to limit those stevedores which can qualify for the allotted nine slots to those who have been and are now entrenched at the Port of Miami, and who routinely have their permits renewed without having to undergo a need assessment.

 In its filings, the County suggests that it also has an interest in preventing destructive competition. Yet there is no evidence in the record demonstrating that competition in the stevedore market will have a destructive effect. Speculation about the possibility of destructive competition is insufficient to justify the burden on interstate commerce, and the County has not presented any economic analyses or studies to support its allegations. *See Medigen*, 985 F.2d at 167 ("[b]ecause the 'ruinous' effects of competition are entirely speculative, their prevention cannot justify restricting market entry" under the undue burden test). Thus, there is no triable issue of fact as to destructive competition. But, even if there were evidence of some destructive competition in the stevedore market, the ordinance's, as applied, burden

on interstate commerce would likely still be "clearly excessive," particularly because the County has less burdensome means to prevent destructive competition. *See, e.g., S. Waste,* 420 F.3d at 1291 (allowing long-term exclusive contract as long as it is subject to an open bidding process).

In sum, what the County has done is to effectively create an entrenched oligopoly, with no termination date in sight, and without giving other interested stevedores an equal opportunity to apply to become part of the oligopoly. This practice violates the dormant Commerce Clause.

**3. THE COUNTY AS A MARKET PARTICIPANT**

The so called "market participant" doctrine provides that a local government acting as a market participant, rather than as a market regulator, is not subject to the strictures of the Commerce Clause. *See White v. Mass Council of Const. Employers,* 460 U.S. 204, 208, 103 S.Ct. 1042, 75 L.Ed.2d 1 (1983); *Reeves, Inc. v. Stake,* 447 U.S. 429, 436–37, 100 S.Ct. 2271, 65 L.Ed.2d 244 (1980). Local ordinances or acts in the specific market in which the local government participates do not violate the dormant Commerce Clause. *See S.–Cent. Timber Dev., Inc. v. Wunnicke,* 467 U.S. 82, 97–98, 104 S.Ct. 2237, 81 L.Ed.2d 71 (1984). This doctrine does not apply here, however, because the County is not a "participant" in the stevedore market.

The County manages the Port, but it does not offer stevedore services. Indeed, the County does not even hire stevedores. Rather, stevedores are hired by cargo carriers. The County, of course, competes with ports operated by other counties and municipalities for cargo carriers and invests significant resources in the Port of Miami. The market at issue in this case, however, is not the market for port services, but the market for stevedores. There is no evidence that the County is a participant in the stevedore market.

In *South–Central,* the Supreme Court rejected a similar attempt to rely on the market participant doctrine. *South–Central* involved a statute in Alaska requiring that timber taken from the state be processed within the state. Alaska argued that it was engaged in the direct sale of timber and was not subject to the requirements of the dormant Commerce Clause. The Supreme Court disagreed and held that the market participant doctrine did not apply because Alaska was not a participant in the timber-processing market. *See* 467 U.S. at 97–98, 104 S.Ct. 2237. The Court reiterated that the "market" for purposes of the doctrine has to be narrowly defined:

> The limit of the market-participant doctrine must be that it allows a State to impose burdens on commerce within the market in which it is a participant, but allows it to go no further. The State may not impose conditions, whether by statute, regulation, or contract, that have a substantial regulatory effect outside of that particular market.

*Id.* Otherwise, "the doctrine has the potential of swallowing up the rule that States may not impose substantial burdens on interstate commerce even if they act with the permissible state purpose of fostering local industry." *See id.* The Court then concluded that the dormant Commerce Clause barred Alaska's protectionist statute. *See id.*

The former Fifth Circuit reached a similar result in *J.L. Smith v. Dept. of Agriculture of the State of Georgia,* 630 F.2d 1081 (5th Cir.1981). *J.L. Smith* involved a regulation mandating that, when conditions were crowded, space assignments in the Georgia-owned farmer's market be made on the basis of state residency, with preference given to residents of Georgia. An out-of-state farmer challenged the regulation under the dormant Commerce Clause,

and Georgia asserted the market participant defense based on its ownership of the market. The Fifth Circuit rejected this defense because Georgia "neither produce[s] the goods to be sold at the market, nor engage[s] in the actual buying or selling of those goods." Georgia "simply provided a suitable marketplace for the buying and selling of privately owned goods." As such, Georgia was a market regulator, and not a market participant. *See id.* at 1083.

*South–Central* and *J.L. Smith* are controlling here. The market participant doctrine does not help the County because the market for port services is distinct from the market for stevedore services. That the County is a participant in the market for port services does not make the County a participant in the market for stevedores. The County does not offer or buy stevedore services. Rather, like Georgia in *J.L. Smith,* the County simply provides a suitable market place—the Port of Miami—for stevedores to offer their services. Ownership of the Port does not make the County a participant in the stevedore market any more than ownership of the farmers' market made Georgia a participant in the produce market. The County's market participant defense fails as a matter of law.

### 4. MUNICIPAL LIABILITY

■■■ Finally, I reject the County's argument that Florida Transportation has failed to establish municipal liability. A plaintiff seeking to hold a municipality liable under § 1983 must identify a municipal policy or custom that caused his injury. *See McDowell v. Brown,* 392 F.3d 1283, 1290 (11th Cir.2004) (*citing Monell v. Dept. of Social Serv.,* 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)). In a case involving a duly enacted local law. municipal liability is established through the municipality's adoption of the purported unconstitutional law. *See, e.g., McKu-*

*sick v. City of Melbourne,* 96 F.3d 478, 483 (11th Cir.1996) (municipal liability can be established "when the allegedly unconstitutional municipal action 'implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by the body's officers' "); *Little v. City of North Miami,* 805 F.2d 962, 967 (11th Cir.1986) ("Because we conclude that the resolution in question can be fairly characterized as a 'decision officially adopted and promulgated' by the City Council of North Miami, we conclude that the minimum requirements for imposing municipal liability have been alleged"). Municipal liability is also established where a municipality's final policy makers have acquiesced in a longstanding practice or custom which constitutes the "standard operating procedure" of the local governmental entity. *See Brown v. City of Fort Lauderdale,* 923 F.2d 1474, 1481 n. 11 (11th Cir.1991) (*citing Jett v. Dallas Indep. School Dist.,* 491 U.S. 701, 735, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989)).

■■■ Here, the County enacted the stevedore permit ordinance, and the County's admitted final policy makers have acquiesced in the practice of applying the ordinance so as to create an undue burden for new applicants for stevedore permits. As the County notes in its motion for summary judgment, the Board of County Commissioners and the County Manager had final policy making authority with respect to stevedore permits. *See* County Mem. at 16. *See also Rosario v. Miami–Dade County,* 490 F.Supp.2d 1213, 1222 (S.D.Fla.2007); *Hershell Gill Consulting Engineers, Inc. v. Miami–Dade County,* 333 F.Supp.2d 1305, 1333–34 (S.D.Fla. 2004).

From 1999 to 2005, the port director denied Florida Transportation's seven applications for stevedore permits primarily based on his need assessment. During the

same period, the permits of the established stevedores were routinely renewed without a need assessment. The County Manager explicitly approved this discriminatory practice in two memoranda to the Board of County Commissioners. In a memorandum recommending that the Board affirm the denial of Florida Transportation's application in 2000, the County Manager stated:

It is important to note that it has been many years since a new stevedore permit has been issued at the Port of Miami. The Port Director has determined that the current number of stevedore permits, nine (9), is the optimal number for efficient operations at the Port. It is also important to note that this is not the first time a stevedore permit has been denied. In prior years, certain stevedores have had to buy a company with an existing permit at substantial costs or wait until the Port director determined that there was a need for such.

*See* County Manager's July 25, 2000, Memorandum [D.E. 133]. Based on this recommendation, the Board of County Commissioners affirmed the denial of Florida Transportation's application.

Similarly, on September 11, 2001, the County Manager forwarded to the Board the port director's memorandum "indicat[ing] that present stevedore permit holders are able to adequately serve new and existing business at this time." *See* County Manager's September 11, 2001, Memorandum [D.E. 104] (enclosing the port director's letter and survey).

In light of this evidence and the administrative examiner's finding of how the ordinance is applied, the County cannot seriously argue that there is no municipal liability here. The County's attempt to disavow responsibility for a practice widely accepted by its final policy makers is untenable.

## IV. CONCLUSION

In sum, the County's stevedore permit ordinance, as applied, excludes Florida Transportation and other stevedores from the interstate stevedore market at the Port of Miami, while at the same time providing virtually automatic renewals for the existing and entrenched stevedores. This practice cannot survive the undue burden test, and therefore, violates the dormant Commerce Clause.

The County is entitled to summary judgment on Florida Transportation's pre-October 3, 2001 claims, and Florida Transportation is entitled to summary judgment on liability on its post-October 3, 2001 claims.

A trial on damages will be set by separate order.