**AMERICAN TRUCKING ASSOCIATIONS, INC.,**
Plaintiff,

v.

**The CITY OF LOS ANGELES, et al., Defendants.**

**No. CV 08–04920 CAS (CTx).**

United States District Court,
C.D. California,
Western Division.

Sept. 9, 2008.

---

Christopher C. McNatt, Jr., Scopelitis Garvin Light Hanson and Feary LLP, Pasadena, CA, Richard O. Levine, Seth D. Greenstein, Stephen S. Anderson, Jr., W. Stephen Cannon, Constantine Cannon LLP, Washington, DC, Robert Digges, Jr., American Trucking Associations Inc., Arlington, VA, for Plaintiff.

Bryant S. Delgadillo, Kaye Scholer, Los Angeles, CA, Paul L. Gale, Ross Dixon and Bell LLP, Irvine, CA, Adriano Martinez, David R. Pettit, Melissa Lin Perrella, Natural Resources Defense Council, Santa Monica, CA, for Defendants.

## ORDER DENYING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

CHRISTINA A. SNYDER, District Judge.

## I. INTRODUCTION AND BACKGROUND

Defendant City of Los Angeles owns and operates the Port of Los Angeles. Compl. ¶ 12; Opp'n at 4. Defendant City of Long Beach owns and operates the Port of Long Beach. Compl. ¶ 12; Opp'n at 4. The Port of Los Angeles and the Port of Long Beach ("the Ports") form a single contiguous port area along San Pedro Bay in Los Angeles County. Mot. at 4; Opp'n at 2. Authority to manage the assets of the port and craft rules governing port-related activities in each city is invested in defendants Board of Harbor Commissioners of the City of Los Angeles and Board of Harbor Commissioners of the City of Long Beach. Opp'n ¶ 4; Compl. ¶ 8.

Cargo is carried to and from the Ports through a process of "drayage," whereby cargo containers are unloaded from ships and loaded onto truck trailers, from which they are "drayed" by motor carriers to customers, off-dock terminals, or railheads. Compl. ¶ 14. Motor carriers provide these drayage services through contracts with end users of the cargo, or through contracts with ocean carriers. Compl. ¶ 14.

Plaintiff American Trucking Associations, Inc. ("ATA") is the non-profit national trade association for the trucking industry. Compl. ¶ 7. Intermodal Motor Carriers Conference ("IMCC") is an affiliated conference of the ATA, and counts among its members several motor carriers who provide drayage services to the Ports of Los Angeles and Long Beach. Compl. ¶ 7.

On December 7, 2007, the California Air Resources Board ("CARB") adopted rules to limit the emissions from diesel trucks providing drayage services at California ports. Compl. ¶ 26. Around this same time, the Ports developed a Clean Air Action Plan ("CAAP"). Opp'n at 3. Included in the CAAP was the Clean Trucks Program, a multi-faceted program designed to reduce the emissions of trucks providing drayage services to the Ports. Opp'n at 3.

Under the auspices of the Clean Trucks Program, the Ports adopted tariff amendments mandating that all drayage trucks that service the Ports must meet the Environmental Protection Agency ("EPA") 2007 truck emissions standards by 2012. Opp'n at 6. The Ports also adopted tariff amendments instituting a "Clean Truck Fee," to be paid by the beneficial cargo owner of merchandise leaving the ports, proceeds from which would be used to help finance the retrofits and truck replacements necessitated by the truck ban. Opp'n at 7.

On March 20, 2008, defendant Los Angeles Harbor Board adopted an order which provides that "beginning October 1, 2008, at 8:00 am, no Terminal Operator shall permit access into any Terminal in the Port of Los Angeles to any Drayage Truck

unless such Drayage Truck is registered under a Concession from the Port of Los Angeles ..." Compl. ¶ 19. On February 19, 2008, defendant Long Beach Harbor Board similarly mandated that drayage trucks would be required to hold a concession agreement with the City of Long Beach in order to enter the Port of Long Beach beginning on October 1, 2008. Compl. ¶ 22.

The Los Angeles and Long Beach concession agreements contain many of the same requirements. Specifically, each concession agreement dictates that motor carriers accessing the Port must (1) remain licensed and in good standing; (2) enter, verify, and update identifying information into the Port's Drayage Truck Registry ("Registry") for each truck and for each driver accessing the Port; (3) be responsible for the compliance and performance of their drivers who access the Port; (4) cause all trucks to comply with the Clean Trucks Program; (5) comply with parking restrictions and submit for approval a parking plan for trucks accessing the Port; (6) submit a truck maintenance plan; (7) comply with truck safety and operations regulations, and make available all records required for compliance with existing regulatory programs, including documents on driver qualifications; (8) ensure that each of its drivers has a valid Transportation Worker Identification Card ("TWIC"); (9) ensure that each of its trucks has a Radio Frequency Identification Device ("RFID") connected to the Registry so that the relevant information is available when the truck enters the Port; (10) ensure that all trucks comply with security laws and regulations; (11) ensure that all trucks post placards providing a phone number to allow the public to report emissions and safety concerns; (12) implement necessary technology required by the concession or the Clean Trucks Program; and (13) ensure that they have the financial capability to exe-cute the concession agreements. Los Angeles Concession Agreement (LACA) at 2–4; Long Beach Concession Agreement (LBCA) at 2–3.

In addition, the Los Angeles concession agreement requires that motor carriers fully transition away from independent contractor drivers, mandating that by December 31, 2013, all of the drivers accessing the port must be employees of the motor carrier rather than independent contractors. LACA at 2. To accomplish this, the concession agreement provides for a gradual phase-in period, with a first benchmark provision requiring that, by December 21, 2009, 20 percent of drivers used by any motor carrier signing a concession agreement be employees rather than independent contractors. LACA at 2–3. The Long Beach concession agreement, by contrast, does not require a transition away from independent contractor drivers, but does require that motor carriers give hiring preference to drivers with a history of providing drayage services to the Port. LBCA at 2.

Under the Los Angeles concession agreement, motor carriers must also pay an initial $2500 refundable fee, with a $100 non-refundable annual administrative fee per truck. LACA at 9. Under the Long Beach plan, motor carriers must pay an initial $250 application fee and a $100 annual administrative fee per truck. LBCA at 7. The two plans also require that motor carriers carry and provide to their drivers varying forms of insurance. Opp'n at 9.

On July 28, 2008, plaintiff American Trucking Association, Inc. ("ATA") filed the complaint in this action against defendants City of Los Angeles, Harbor Department of the City of Los Angeles, Board of Harbor Commissioners of the City of Los Angeles, City of Long Beach, Harbor Department of the City of Long Beach, and Board of Harbor Commissioners of the City of Long Beach. The first and second

claims of the complaint allege that the Los Angeles and Long Beach concession agreements violate the Supremacy Clause and the Federal Aviation Administration Authorization Act of 1994 ("the FAAA"). The third claim alleges that the concession agreements place an undue burden on and discriminate against the right of plaintiff motor carriers to engage in interstate commerce.

On July 30, 2008, plaintiff filed a motion for preliminary injunction on counts one and two of plaintiff's complaint. On August 20, 2008, defendants filed their opposition. A reply was filed on August 29, 2008. A hearing was held on September 8, 2008. After carefully considering the arguments set forth by the parties, the Court finds and concludes as follows.

## II. LEGAL STANDARD

 A preliminary injunction is appropriate when the moving party shows either (1) a combination of probable success on the merits and the possibility of irreparable harm, or (2) the existence of serious questions going to the merits and that the balance of hardships tips sharply in the moving party's favor. *See Rodeo Collection, Ltd. v. West Seventh,* 812 F.2d 1215, 1217 (9th Cir.1987). These are not two distinct tests, but rather "the opposite ends of a single 'continuum in which the required showing of harm varies inversely with the required showing of meritoriousness.'" *Id.* A "serious question" is one on which the movant "has a fair chance of success on the merits." *Sierra On–Line, Inc. v. Phoenix Software, Inc.,* 739 F.2d 1415, 1421 (9th Cir.1984).

## III. DISCUSSION

### A. LIKELIHOOD OF SUCCESS ON THE MERITS

Plaintiff argues for a preliminary injunction on the basis that the concession agreements are preempted by the FAAA.

## 1. STATUTORY BASIS FOR PRE-EMPTION

 "Federal preemption occurs when: (1) Congress enacts a statute that explicitly preempts state law; (2) state law actually conflicts with federal law; or (3) federal law occupies a legislative field to such an extent that it is reasonable to conclude the Congress left no room for state regulation in that field." *Tocher v. City of Santa Ana,* 219 F.3d 1040, 1045–46 (9th Cir.2000), abrogated on other grounds, *Tillison v. City of San Diego,* 406 F.3d 1126, 1127 (9th Cir.2005). When a statute provides a reliable indication that Congress intended to preempt state and local regulation, "the scope of federal preemption is determined by the statute." *Id.* at 1046.

Congress enacted the FAAA to achieve deregulation of the motor carrier industry, and therefore, included a "broad preemption statute." *Id.* The statute provides that, with regard to motor carriers, "a State, political subdivision of a State, or political authority of two or more States may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of any motor carrier." 49 U.S.C. § 14501(c)(1).

 Therefore, for a state regulation to be preempted under 49 U.S.C. § 14501(c)(1), the regulation must be "related to the price, route, or service of a motor carrier that transports property." *Tocher,* 219 F.3d at 1047. Relation to price, route, or service is found where "the regulation has more than an indirect, remote, or tenuous effect on the motor carrier's prices, routes, or services." *Id.*

In *Rowe v. N.H. Motor Transp. Ass'n,* —— U.S. ——, ——, 128 S.Ct. 989, 995, 169 L.Ed.2d 933 (2008), the Court held that a Maine statute dealing with carrier services was preempted under the FAAA.

The statute at issue mandated that tobacco retailers could only use carriers for their products who followed certain specific "recipient verification" procedures, for example, procedures to ensure that the person receiving the shipment was of legal age to purchase tobacco. *Id.* The Court held that the statute was preempted because it "related to the price, route, or service" of the carriers. *Id.* Specifically, the Court held that the law, in requiring carriers to provide recipient verification services that they would not otherwise provide, contravened the purpose of the federal law, because it allowed the state, rather than the market, to determine what services motor carriers would provide. *Id.*

The Court in *Rowe* further held that the regulation was not too "tenuous" or "indirect" for preemption to apply, even though the law at issue did not directly regulate the carriers, but instead only regulated the tobacco retailers with regard to which carriers they could employ. *Id.* at 996; *See Tocher,* 219 F.3d at 1047. Because the *effect* of the regulation would be that carriers would have to offer different services than what the market would otherwise dictate, the law had a sufficient effect on carrier services for preemption to apply. *Rowe,* 128 S.Ct. at 996.

In the instant case, plaintiff argues that, like the statute in *Rowe,* the concession agreements are sufficiently related to the "price, route, or service" of motor carriers, and that they are therefore preempted. *See id.* at 995. Unlike the statute in *Rowe,* the concession agreements here do not require that the motor carriers provide a specific service to customers that they would not otherwise provide. *See id.* at 995. Nevertheless, as plaintiff notes, the concession agreements do "establish requirements for motor carriers' hiring decisions, truck routes, parking restrictions, truck maintenance, truck safety, operations regulations, driver health insurance, driver credentials, compliance tags, security, placards posted on trucks, technology, and financial capability." Mot. at 9. Failure to comply with the concession agreements would seemingly have a direct effect on what services the motor carriers could provide, because they would be banned from the Ports, and therefore could not provide drayage services to clients there. *See* Mot. at 15. By contrast, if motor carriers do comply with these requirements, such compliance, which would presumably be costly, would at least likely have an effect on the price of services that the motor carriers charge their customers, and might, as plaintiff argues, have an effect on the services and routes of the motor carriers as well. *See* Mot. at 15. Thus, like the statute in *Rowe,* the concession agreements may force motor carriers to change their prices, routes, or services in a way that the market would not otherwise dictate. *See* 128 S.Ct. at 996.

Furthermore, unlike the statute in *Rowe,* which regulated carriers only indirectly, but was nevertheless preempted, the concession agreements here directly regulate the carriers themselves, at least to the extent that they wish to access the Ports. *See id.* Therefore, the effect of the concession agreements on "price, route, or service," would likely be sufficiently non-tenuous and direct to warrant preemption. *See Tocher,* 219 F.3d at 1047.

As a result, there is a significant likelihood that plaintiff will succeed in showing that the concession agreements fall within the preemption provision of the FAAA. Indeed, defendants do not seem to dispute this, but instead argue, as discussed below, that they are exempted from preemption.[1]

---

1. Both plaintiff's complaint and *amicus curiae* submitted by the NRF propose 49 U.S.C. § 14504a(c) as an additional basis for statutory preemption of the concession agreements. This statute, added to the FAAA in 2005, states "[I]t shall be considered an unreason-

For the foregoing reasons, that Court finds that plaintiff has demonstrated a likelihood of success in showing that 49 U.S.C. § 14501(c)(1) preempts the concession agreements. However, in order for plaintiff to succeed on the merits, the concession agreements must also fall outside the relevant exceptions to preemption.

## 2. EXCEPTIONS TO PREEMPTION

Defendants argue that the concession agreements are not preempted by the FAAA for three reasons, each of which would be sufficient to defeat preemption. First, defendants argue that the concession agreements are not preempted because the Ports reside on sovereign tidelands, and Congress has not evinced an intent to deprive the states of their sovereignty over these lands. Second, they argue that the concession agreements are not preempted by reason of the market participant exception to preemption. Third, defendants posit that the concession agreements are exempt from preemption under the FAAA's statutory safety exception. Although the Court finds that the concession agreements likely fall outside of the first two exceptions, plaintiff is not likely to succeed in showing that the concession agreements are not exempted from preemption under the safety exception.

### a. SOVEREIGN TIDELANDS

■ Defendants argue that because the port terminals are "located on sovereign tidelands, granted to the Ports by the State of California," the concession agreements are saved from preemption. Opp'n at 11–12. As part of their sovereign rights over the tidelands, defendants argue, the Ports have "plenary 'management and control' of the property." Opp'n at 13 quoting *Ill. C.R. Co. v. Illinois*, 146 U.S. 387, 452–53, 13 S.Ct. 110, 36 L.Ed. 1018 (1892). The " 'power to control, regulate and utilize [navigable waterways and the lands beneath them] is absolute,' except as limited by the federal government's power over navigable waters." Opp'n at 13 (quoting *Colberg, Inc. v. State*, 67 Cal.2d 408, 62 Cal.Rptr. 401, 432 P.2d 3 (1967)). Defendants argue that these sovereign rights prevent preemption, because "if Congress intends to take away core incidents of state sovereignty, it must make 'unmistakably clear' that it intends to alter the normal federal-state balance with respect to 'historic powers of the States.' " Opp'n at 15, citing *Gregory v. Ashcroft*, 501 U.S. 452, 461, 111 S.Ct. 2395, 115 L.Ed.2d 410 (1991); *Solid Waste Agency v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 174, 121 S.Ct. 675, 148 L.Ed.2d 576 (2001); *Montana v. United States* 450 U.S. 544, 551–52, 101 S.Ct. 1245, 67 L.Ed.2d 493 (1981). Section 14501, they argue, does not contain an expression of an "unmistakably clear" intent by Congress to diminish the state's authority over its tidelands. Opp'n at 16.

■ The Court is not convinced that the fact that the Ports rest on sovereign tidelands renders them immune from preemption under the FAAA. First, as plaintiff notes, the Supreme Court has held that the "State's power over the beds of navigable waters remains subject to only one

able burden upon interstate commerce for any State or any political subdivision of a State ... to enact, impose, or enforce any requirement or standards with respect to ... any motor carrier or motor private carrier ... in connection with ... (D) the annual renewal of the intrastate authority, or the insurance filings, of the motor carrier or private motor carrier, or other intrastate filing requirement

necessary to operate within the state." 49 U.S.C. § 14504a(c). However, neither plaintiff nor amicus movant provide any caselaw interpreting this provision. Although plaintiff and NRF's argument may have some merit, the Court is not convinced that this statute provides an independent basis for preemption of the concession agreements.

limitation: the paramount power of the United States to ensure that such waters remain free to interstate and foreign commerce." *Montana v. United States,* 450 U.S. 544, 551, 101 S.Ct. 1245, 67 L.Ed.2d 493 (1981); Reply at 3. Thus, even though the state may have management and control over the lands on which the Ports rest, this right is not absolute. *See* Reply at 3. Congress's power to regulate interstate commerce over navigable waterways supercedes the state's plenary control.

Second, none of the cases cited by defendants regarding the "unmistakable intent" requirement is completely analogous to the instant case. For example, the holding requiring an unmistakable intent in *Montana v. United States* dealt specifically with a question of whether the United States could *convey* sovereign land. 450 U.S. 544, 551, 101 S.Ct. 1245, 67 L.Ed.2d 493 (1981) (holding that "deciding a question of title to the bed of a navigable water must, therefore, begin with a strong presumption against *conveyance* by the United States, and must not infer such a conveyance 'unless the intention was definitely declared or otherwise made very plain.'" emphasis added). *Gregory* dealt with a factual situation that did not in any way involve sovereign rights to tidelands. 501 U.S. 452, 461, 111 S.Ct. 2395, 115 L.Ed.2d 410 (1991). In *Solid Waste Agency,* the Court required a clear intent, in part because there was a significant constitutional question raised as to whether the administrative interpretation of a federal statute at issue would violate the Commerce Clause. 531 U.S. 159, 174, 121 S.Ct. 675, 148 L.Ed.2d 576 (2001).

In addition, defendants' argument is weakened by the holding in *Western Oil & Gas v. Cory,* 726 F.2d 1340, 1343 (9th Cir.1984), in which the Court held that the Commerce Clause preempted regulations by a state regarding leasing of its sovereign tidelands.

For the foregoing reasons, the Court finds that plaintiff would have a significant likelihood of success in showing that the fact that the Ports sit on sovereign tidelands does not exempt them from preemption under the FAAA.

**b. MARKET PARTICIPANT EXCEPTION**

In cases of statutory preemption, "the market participant doctrine is based on the proposition that 'pre-emption doctrines apply only to state *regulation.*'" *Engine Mfrs. Ass'n v. South Coast Air Quality Management Dist.,* 498 F.3d 1031, 1040 (9th Cir.2007) (emphasis added). Therefore, if state action is *proprietary,* rather than regulatory, such action is not generally subject to statutory preemption. *Id.* Although the scope of the doctrine may vary depending on the federal statute at issue, "the Court will not 'infer' preemption of proprietary action unless Congress" "indicat[es] ... that a State may not manage its own property when it pursues its purely proprietary interests." *Id.* at 1044.

The Ninth Circuit has held that state action qualifies as proprietary in either of two circumstances. "First, state action is proprietary if it 'essentially reflect[s] the [governmental] entity's own interest in its efficient procurement of needed goods and services, as measured by comparison with the typical behavior of private parties in similar circumstances.'" *Engine Mfrs.,* 498 F.3d at 1041. Proprietary state action can be saved from preemption if it satisfies this test, even if it is a "comprehensive" policy with "wide application." *Id.* Second, "state action is proprietary if 'the narrow scope of the challenged action defeat[s] an inference that its primary goal was to encourage a general policy rather than address a specific proprietary problem.'" *Id.* This test "protects narrow spending decisions that do

not necessarily reflect a state's interest in the efficient procurement of goods or services, but that also lack the effect of broader social regulation." *Id.*

### i. "EFFICIENT PROCUREMENT" TEST

 Plaintiff's ability to rely upon the market participant exception to preemption depends on the likelihood that the concession agreements could be deemed to reflect the Ports' interest in "efficient procurement." *See id.*

In *Engine Manufacturers*, the state required governmental entities "to purchase, procure, lease, or contract for use of vehicles meeting specified air pollution criteria." *Id.* at 1045. The court held that these provisions were not preempted by the Clean Air Act, because they involved "efficient procurement." *Id.* at 1047, 1050. In interpreting the term "efficient procurement," the court noted that " '[e]fficient' does not merely mean 'cheap.' In context, 'efficient procurement' means procurement that serves the state's purposes which may include purposes other than saving money—just as private entities serve their purposes by taking into account factors other than price in their procurement decisions." *Id.* at 1047. It is therefore immaterial if the state or local entity has "policy goals that it seeks to further through its participation in the market . . . so long as the action in question is the state's own market participation." Opp'n at 27.

Defendants argue that the concession agreements reflect the Ports' interests in "efficient procurement" of drayage services, which serve the critical operational needs of the Ports. Opp'n at 26. The efficiency provided by these agreements, defendants argue, stems from a "recognition that in order to grow and to continue to compete successfully in the market, [the Ports] need to address major environmental and security issues." Opp'n at 22. The concession agreements, therefore, "reflect the Ports' efforts to secure trucking services—services critical to their commercial operation—in a way that will further those objectives." *Id.*

Plaintiff and NRF argue, however, that the Ports are not market participants, because they do not participate in any market relevant to the concession agreements. Reply at 8; Br. for NRF at 12. In other words, the Ports themselves are not procurers of motor carrier services. Instead, the services of motor carriers are procured by end users of the cargo drayed or by ocean carriers, each of whom contract with the motor carriers directly. Compl.¶ 14. Therefore, the concession agreements cannot reflect the Ports' interest in "efficient procurement" of motor carrier services.

Essentially, the question as to whether defendants are acting to "procure" motor carrier services for the Ports, and therefore whether they are exempt under the market participation doctrine, depends on the definition of "the market." If defendants are indeed participants in the market for port services, including the services of motor carriers, then the concession agreements could be seen as an effort to efficiently procure those services, and therefore the exception would apply. However, if the defendants are not participants in the market for the services of motor carriers, then the exception will not apply. Although case law provides some conflicting indications, the Court finds that, on balance, plaintiff has a significant likelihood of showing that defendants are not participants in the relevant market.

First, it is noteworthy that the Court has stated that for purposes of the market participation doctrine, the "market" should be "relatively narrowly defined." *South–Central Timber Development, Inc. v. Wunnicke*, 467 U.S. 82, 98, 104 S.Ct. 2237, 81 L.Ed.2d 71 (1984). "The limit of the market-participant doctrine must be that it

allows a State to impose burdens on commerce within the market in which it is a participant, but allows it to go no further." *Id.* at 97, 104 S.Ct. 2237.

In one particularly persuasive case, *Aeroground, Inc. v. City and County of San Francisco,* 170 F.Supp 2d 950, 959 (N.D.Cal.2001), the court held that defendant airport's requirement that employers of cargo handlers use a card check rule (a specific way for employees to designate their preferred union representative) had a high probability of being preempted and that, therefore, a preliminary injunction was warranted. In finding that the airport's market participant argument did not defeat the request for injunctive relief, the court noted that "the card check rule is not an effort by the airport to contract directly with Aeroground, or other employers, for goods or services." *Id.* at 957. In other words, the airport's actions could not be said to be a form of "efficient procurement," because the airport was not in the market for cargo-handling services. *Id.* It would be a different case, the court noted, if defendants themselves purchased Aeroground's cargo-handling services. *Id.* at 958. Because the airlines, not defendant airport, purchased Aeroground's services, however, the card check regulation was more akin to a licensing scheme, which controlled the way in which employers of cargo handlers could contract with the various airlines at the airport. *Id.*

The court in *Aeroground* noted the factual similarities of its case to *Golden State Transit Corp v. City of Los Angeles. Id.* at 957; *See Golden State,* 475 U.S. 608, 106 S.Ct. 1395, 89 L.Ed.2d 616 (1986). In *Golden State,* the Court similarly held that a city requirement conditioning the renewal of taxicab franchises on the settlement of a labor dispute was preempted. *Id.* at 614, 106 S.Ct. 1395. In a subsequent Supreme Court case, the Court, commenting on *Golden State,* indicated that the market participant doctrine would likely have applied in *Golden State* if the city had "purchased taxi services from Golden State in order to transport city employees," and, through this procurement activity, had imposed the labor dispute requirement. *Bldg. and Constr. Trades Council v. Associated Builders & Contractors of Mass./ R.I., Inc.,* 507 U.S. 218, 227–228, 113 S.Ct. 1190, 122 L.Ed.2d 565 (1993) (hereinafter *"Boston Harbor"*).

Furthermore, in *Aeroground,* the court noted that it was insufficient that the genesis of the regulation there at issue was occasioned by the airport's desire to increase efficiency. 170 F.Supp 2d at 958. "The issue is not whether the government entity operates a business, but whether the law at issue enables the city or state entity to procure goods or services in order to operate as a business." *Id.* at 958. Therefore, even if the rule were intended only "as a device for increasing the airport's revenues," not for any substantive policy reasons, the market participant exception would not necessarily apply, as "simply addressing the financial interests of a public entity does not make such efforts those of a market participant." 170 F.Supp.2d at 958.

Therefore, *Aeroground* suggests that plaintiff in the instant action has a significant likelihood of showing that the market participant exception does not apply to the concession agreements. Like the airport and the cargo handlers in *Aeroground,* the ports and motor carriers do not contract directly for the provision of motor carrier services. *See id.* at 957. Instead, the concession agreements, like the regulations in *Aeroground,* are akin to a licensing scheme, whereby the Ports license the motor carriers to do business at the ports, provided that they follow certain regulations. *See id.* at 958.[2] Under *Aero-*

---

**2.** It is true that a few Commerce Clause preemption cases suggest that an entity does

*ground,* such a system would fall outside of the scope of the "efficient procurement" test for the market participation exception.

Defendants attempt to distinguish *Aeroground* on the ground that the policies at issue there were imposed by the airport through a rule, rather than an agreement between the parties. Opp'n at 28. Therefore, they argue, the behavior at issue in *Aeroground* was on its face more akin to a regulation than market participation. Opp'n at 28. However, there is no indication that the *Aeroground* court found the context in which the condition was issued to be dispositive of the analysis. Furthermore, defendants' argument is weakened by the fact that in *Golden State,* the preempted action was a refusal by defendant city to issue a franchise renewal, rather than a regulation promulgated by the city. 475 U.S. 608, 609, 106 S.Ct. 1395, 89 L.Ed.2d 616.

Defendants also argue that *Aeroground* was wrongly decided to the extent that it held that conduct that does not involve "procurement" is outside of the market participant exception. Opp'n at 28. For example, defendants cite *Reeves, Inc. v. Stake,* 447 U.S. 429, 437, 100 S.Ct. 2271, 65 L.Ed.2d 244 (1980), in which the Court determined that the market participant exception applied to discriminatory practices by the state regarding the *sale* (rather than procurement) of cement. Defendants also cite dicta in *Boston Harbor,* where the Court stated that "when a State owns and manages property, for example, it must

interact with private participants in the marketplace," and in doing so, its behavior cannot be deemed to be "regulation" subject to preemption. 507 U.S. 218, 227, 113 S.Ct. 1190, 122 L.Ed.2d 565 (1993). Finally, defendants point out that the Supreme Court has stated that the market participation exception "does not require the city to stop at the boundary of formal privity of contract." *White v. Mass. Council of Constr. Emplrs.,* 460 U.S. 204, 211, 103 S.Ct. 1042, 75 L.Ed.2d 1 (1983).

However, at issue in *Boston Harbor* was a contract between a government agency charged with providing certain water-supply services and individual contractors who supplied those water supply services. *Id.* at 231, 103 S.Ct. 1042. The agency, therefore, was acting as a "purchaser" in the market for contractors. *Id. White* involved requirements imposed by the City of Boston on the hiring practices of construction contractors with whom it contracted. 460 U.S. at 206, 103 S.Ct. 1042. When the Court held that the market participant exception extends beyond "privity of contract," it was referring to the effect of the requirements on the employees of the public contractors, contractors from whom the City procured services. *See id.* at 211, 103 S.Ct. 1042. Neither *Reeves,* nor *Boston Harbor,* nor *White* dealt with a situation presented by the instant case, where the defendant is not acting as a direct buyer or seller in the market at issue.

participate in the market when it provides facilities to entities, who in turn provide their services to others. *See, e.g., Transport Limousine of Long Island, Inc. v. Port Auth. of N.Y. and N.J.,* 571 F.Supp. 576, 581 (E.D.N.Y. 1983) (Port Authority's imposition of fees on limousine services in exchange for counter space did not conflict with the Commerce Clause, because Port Authority was acting as a "participant in the market for ground transportation services because it provided facili-

ties to limousine services."); *Four T's, Inc. v. Little Rock Mun. Airport Com'n,* 108 F.3d 909, 913 (8th Cir.1997) (airport's fee schedule for car rental companies operating in the terminal did not violate the Commerce Clause, because the airports, in providing facilities to the rental companies, were "participating in the rental car market.") However, these cases do not persuade the Court that the concession agreements are subject to the market participant exception.

Furthermore, a recent decision from the Southern District of Florida with similar facts to the instant action provides a persuasive argument in favor of plaintiff's contentions herein. In *Florida Transportation Service, Inc. v. Miami–Dade County,* 543 F.Supp.2d 1315, 1327 (S.D.Fla.2008), plaintiffs brought a Commerce Clause challenge to the Port of Miami's limitations on the number of permits that would be given to stevedores to work the port. The court held that the market participant exception did not apply, because the county was "not a 'participant' in the stevedore market." *Id.* at 1332. The court found that although the county managed the Port, it did not offer stevedore services or hire stevedores. *Id.* Furthermore, although the Ports competed with other ports, the market at issue was not the market for port services, but rather the market for stevedores. *Id.*

### ii. "NARROW SCOPE" TEST

██ Under the second market participant test employed by the Ninth Circuit, "state action is proprietary if 'the narrow scope of the challenged action defeat[s] an inference that its primary goal was to encourage a general policy rather than address a specific proprietary problem.' " *Engine Mfrs.,* 498 F.3d at 1041. This test "protects narrow spending decisions ... that lack the effect of broader social regulation." *Id.*

Defendants argue that the Ports' concession agreements are applicable only in narrow circumstances. Specifically, the concession agreements apply only to drayage services on Port land "for purposes directly related to the Ports' commercial operations on the land." Opp'n at 29. The "specific proprietary problem" faced by the Ports is "how to make the Ports more competitive in the future while ensuring that environmental and safety/security concerns raised by drayage trucks are effectively addressed so that the Ports'

neighbors do not impede efforts to maximize the Ports' commercial success." Opp'n at 30.

Although the concession agreements do address specific proprietary problems faced by the Ports, it is questionable whether the concession agreements would fall under the "narrow scope" test. *See Engine Mfrs.,* 498 F.3d at 1041. First, the test was designed to protect "narrow spending decisions," which the concession agreements almost certainly are not. Second, the agreements may not be sufficiently "narrow," as they contain numerous provisions regulating different aspects of the motor carriers' services, and apply to all motor carriers wishing to access the Ports.

Given the problems associated with characterizing the concession agreements as "efficient procurement" or "narrow" in scope, there is a significant likelihood that plaintiff will succeed in showing that the market participant exception to preemption does not apply in this case.

### c. THE "SAFETY EXCEPTION"

The provision of the FAAA preempting state regulation "related to the price, route, or service of a motor carrier that transports property," contains an express exception to preemption. *See* 49 U.S.C. § 145019(c). Specifically, this section holds that the preemption provision "shall not restrict the safety regulatory authority of a State with respect to motor vehicles ..." 49 U.S.C. § 14501(c)(2)(A).

██ "There is little case law interpreting the limits of the safety exception on federal preemption." *Tillison,* 406 F.3d at 1129. However, the United States Supreme Court has specified that, in order to fall within the safety exception, a statute, regulation, or provision must be genuinely responsive to public safety concerns. *City of Columbus v. Ours Garage and Wrecker*

*Service, Inc.,* 536 U.S. 424, 426, 122 S.Ct. 2226, 153 L.Ed.2d 430 (2002). A regulation does not fall under the safety exception if it is an economic regulation under the guise of a public safety regulation. *Id.* Therefore, the *Tillison* court held "our focus in a preemption case like this one is whether the purpose and intent of the body passing the law at issue, whether state or municipality, was truly safety." 406 F.3d at 1129.

■ However, the Supreme Court has also held that the "narrowest possible construction of the exception" is "surely resistible," because the FAAA preemption rule and the safety exception "do not necessarily conflict." *Ours Garage,* 536 U.S. at 441, 122 S.Ct. 2226. Instead, the safety exception "seeks to save from preemption state power 'in a field which the States have traditionally occupied.'" *Id.*

■ Defendants argue that the safety exception applies to the concession agreements, because the agreements were "intended in some substantial measure to achieve enhanced Port safety and to address gaps in Port security." Opp'n at 38. According to defendants, the concession agreements address some "traditional" safety concerns, such as "concerns that older trucks may pose road hazards that newer trucks do not pose" as well as concerns related to "Port security." Opp'n at 38. For example, defendants state that they currently lack any information or records about motor carriers entering the Port, and that the concession agreements address this security concern by allowing the Ports to track the identity of drivers and by holding the drivers accountable to the Ports' rules. Declaration of Dr. Geraldine Knatz ¶ 36–38.

There does not appear to be any case law addressing the question of whether security concerns analogous to the concerns identified by the Ports fall within the safety exception. Some of the cases involving towing have, however, indicated that the safety exception does cover regulations that address safety concerns beyond pure motor vehicle operation safety. For example, the regulations on towing companies upheld in *Tillison* improved safety by reducing "dangerous confrontations" that might result from towing mistakes and "protect[ed] the vehicle owner from being stranded at a dangerous time and location." 424 F.3d at 1104.

Plaintiff contends that the safety exception does not apply to the concession agreements. First, plaintiff argues that the "Department of the California Highway Patrol has exclusive jurisdiction for the regulation of safety of operation of motor carriers of property," and therefore the Ports and the cities of Los Angeles and Long Beach lack authority to impose motor carrier regulations. Mot. at 18; Cal. Vehicle Code § 34623(a). This argument is unconvincing, as the safety regulations at issue are not purely related to the "safety of *operation* of motor carriers of property," but rather address broader concerns more tangentially related to the operation of motor carriers and not under the authority of the California Highway Patrol, such as the security of the Ports. *See* Cal. Vehicle Code § 34623(a) (emphasis added). Furthermore, defendants point out that the Ports have independent authority to address safety and security issues, granted by both of the city charters, which give them the authority to make and enforce necessary rules and regulations governing the Ports. Opp'n at 42. Moreover, defendants argue that the California Highway Patrol's "'exclusive authority' as a general matter over truck safety cannot reasonably be construed to prohibit a landowner, whether private or public, from adopting safety-related rules for vehicles seeking entry onto their property." Opp'n at 43.

Plaintiff next argues that the Supreme Court's holding in *Castle v. Hayes Freight Lines, Inc.*, 348 U.S. 61, 75 S.Ct. 191, 99 L.Ed. 68 (1954), precludes the application of the safety exception in this case. In *Castle*, the Court held that under the Federal Motor Carrier Act, a state could not punish a motor carrier for repeated violations of safety standards by suspending the motor carrier's right to engage in interstate commerce over the state's roads. *Id.* at 63–64, 75 S.Ct. 191. However, this case was decided forty years before the passage of the FAAA and the safety exception, and involved a significantly different factual scenario than the one at issue.

In addition, plaintiff contends that the concession agreements do not fall within the safety exception, because "the Ports concede that the Plans go beyond safety and security to environmental regulation— a matter well outside the purview of the claimed exception." Reply at 16. However, case law examining the safety exception does not indicate that regulations have to have been passed for the exclusive purpose of promoting safety. As long as the "purpose and intent ... was truly safety," the safety exception may apply. *See Tillison*, 406 F.3d at 1129.

Plaintiff also contends that the concession agreements do not fall within the safety exception, because certain security measures, namely the Registry and the Federal Transportation Worker Identification Credential ("TWIC") Program, will be implemented regardless of whether or not the concession agreements are enjoined. Reply at 18. However, this assertion is not sufficient to show that the concession agreements could not fall within the safety exception. Defendants have indicated that "the security measures that are integrated into the concession contracts cannot be implemented independently of the concession program" and that delays in implementation of the concession contracts "will result in further delay in the Port's ability to implement security measures protecting the Port and will make it impossible to rapidly and effectively mitigate a known security vulnerability." Opp'n at 48; Declaration of John R. Holmes ¶ 44.

Finally, plaintiff's argument that the Ports' security regulations are preempted by regulations of port security contained in § 102 of the Maritime Transportation Security Act (codified at 46 U.S.C. § § 70107–17) and the Security and Accountability for Every Port Act of 2006 (Pub.L. No. 109–347) is not persuasive. Plaintiff argues that these regulations occupy the entire field of port security, but yet plaintiff only identifies one provision covering port trucking, which merely directs the Secretary of Homeland Security to implement a threat assessment screening device for drivers accessing ports. *See* 6 U.S.C. § 924. Although the legislative history shows some intent to preempt state regulations that *conflict* with these federal regulations, it does not evince any intent to preempt all state regulations not inconsistent with the regulations in the field of port trucking. *See* Fed.Reg. 60448, 60468 (Oct. 22, 2003). ("We have determined that it would be inconsistent with the federalism principles stated in the Executive Order to construe the MTSA as not preempting State regulations that conflict with the regulations in this final rule.")

Based on the foregoing, the Court finds that the defendants have shown that there is a significant probability that the concession agreements fall under the safety exception to the FAAA, and that they may therefore be saved from preemption. As a result, the Court finds that plaintiff has failed to show any, and certainly not a substantial, likelihood of success on the merits.

## B. IRREPARABLE HARM

█ Plaintiff argues that its members will suffer irreparable injury if the concession agreements are not enjoined. Much of the harm that plaintiff alleges stems from the costs in complying with the concession agreements. For example, plaintiff alleges that ATA members who sign the concession agreements will have to incur the costs needed to "prepare parking and maintenance plans, purchase placards and identification technology, and undertake administrative tasks relating to truck maintenance, truck safety and operations, driver health insurance, driver credentials, and financial capability." Mot. at 27. Furthermore, they claim that "ATA members that refuse to sign the Concession Agreements will suffer immediate direct financial loss." Mot. at 25. However, although plaintiff might incur various forms of costs from the implementation of the concession agreements, "monetary injury is not normally considered irreparable." *L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1202 (9th Cir.1980). Therefore, to make a showing of irreparable harm, plaintiff will need to show harm beyond monetary injuries.[3]

█ Plaintiff alleges that two types of non-monetary harm will result if the injunction is not granted. First, plaintiff alleges that if an ATA member chooses not to sign the concession agreement, its subsequent inability to access the ports will cause their ongoing relationship with their customers to suffer, and as a result, they will lose goodwill and the reputation they have built up with their clients. Mot. at

26. The Ninth Circuit has held that injury to goodwill and reputation can indeed constitute irreparable harm. *Rent–A–Center Inc. v. Canyon Tele. & Appliance Rental, Inc. 944 F.2d 597, 603* (9th Cir.1991); *Citicorp Services, Inc. v. Gillespie*, 712 F.Supp. 749, 754 (C.D.Cal.1989).

However, in this case, although there is some chance that ATA members could experience a loss of goodwill, the possibility is speculative and not sufficient, alone, to constitute irreparable injury. First, it is significant to note that the loss of goodwill plaintiff alleges will occur only if an ATA member chooses not to sign the concession agreement. Thus the loss of goodwill is avoidable if ATA members choose to sign the agreement, knowing that, if plaintiff's action is ultimately successful, they may receive financial compensation for the injuries incurred. *C.f. Citicorp Services, Inc. v. Gillespie*, 712 F.Supp. 749, 754 (C.D.Cal. 1989) (plaintiff would suffer irreparable injury from loss of goodwill from being *barred, by statute*, from entering the escrow transactions market in California). It is not clear how many ATA members would actually choose to not sign the concession agreements. Plaintiff has only submitted one declaration from a motor carrier executive evincing any intent to forgo signing a concession agreement; however, the declarant only "tentatively" intends to forgo signing the Los Angeles concession agreement, and not the Long Beach concession agreement, due to the Los Angeles concession agreement's requirement that motor carriers transition to

---

**3.** Plaintiff argues that, because defendants "threaten to foreclose such relief by invoking their Eleventh Amendment rights as to tidelands trustees for California," ATA members may not be able to recover monetary damages. Reply at 24. Because the Court has herein found that defendants are not likely to succeed on the tidelands trust argument, the Court finds that damages for monetary injury

are unlikely to be foreclosed. Plaintiff also argues that "immediate financial harms would be irreparable" because Supremacy Clause actions only bring injunctive and declaratory relief. Mot. at 28. However, plaintiff does not provide any support for this proposition, and the Court believes that monetary relief will be available to ATA members under some theory.

an all-employee workforce. Declaration of Gregory L. Owen ¶ 32. This particular provision does not take effect fully until December 2013, with the first incremental step (20 percent employee workforce) not implemented until December 2009. *See* LACA at 3. Because this provision is significantly delayed in taking effect, and motor carriers can make their decision on whether to sign the concession agreements in the interim, plaintiff's argument that loss of goodwill will result from failure to immediately enjoin the agreement is too speculative to justify immediate injunctive relief.

▮ Likewise, plaintiff's second argument for non-monetary injury—that motor carriers might be driven out of business if they choose to sign only the Long Beach agreement, but not the Los Angeles agreement—is also insufficient, because the only reason cited for this potential outcome is the Los Angeles independent contractor phase-out. *See* LACA at 3; Reply at 23–24. Again, because this does not begin to take effect for another year, plaintiff has not shown that a preliminary injunction is necessary to prevent motor carriers from suffering irreparable harm caused by going out of business.

Plaintiff also argues that because the concession agreements violate the Supremacy Clause of the Constitution, harm should be presumed. The Ninth Circuit has indeed stated that "unlike monetary injuries, constitutional violations cannot be adequately remedied through damages and therefore generally constitute irreparable harm." *Nelson v. Nat. Aeronautics & Space Admin.*, 530 F.3d 865, 882 (9th Cir. 2008). However, the court has indicated that this presumption is not automatic. *See, e.g., Associated Gen. Contractors, Inc. v. Coalition for Economic Equity*, 950 F.2d 1401, 1412 (9th Cir.1991) (indicating that it is the court's role to determine whether a party alleging a constitutional infringement "is entitled to such a presumption of harm"); *Monterey Mech. Co. v. Wilson*, 125 F.3d 702 ("We have stated that an alleged constitutional infringement will *often* alone constitute irreparable harm.") (emphasis added). In the case of Supremacy Clause violations, such a presumption is not necessarily warranted. For example, in *Golden Gate Restaurant Ass'n v. San Francisco*, in which plaintiffs challenged a municipal ordinance on the grounds that it was preempted by the federal Employee Retirement Income Security Act, the Court did not presume irreparable injury and instead held that plaintiff's injury was "entirely economic." 512 F.3d 1112 (9th Cir.2008).

Courts have generally held that a presumption of harm is warranted in cases where there was also an actual harmful effect. For example, in *Nelson*, the Court held that harm should be presumed. In that case, plaintiffs faced a choice of either losing their jobs, or keeping their jobs and being forced to submit to a potentially unconstitutional background check, both of which, the court concluded, constituted actual irreparable harm. 530 F.3d at 882. Likewise, in *Citicorp*, the Court stated that a presumption of irreparable harm was "warranted" in part because the plaintiff had shown actual irreparable harm. 712 F.Supp. at 753–54. Because plaintiff has not shown sufficient irreparable harm in this case, a presumption of irreparable harm is not warranted.

## C. BALANCE OF HARDSHIPS

▮ The balance of hardships in this case weighs in favor of defendants. The Ninth Circuit has indicated that injuries involving "preventable human suffering" outweigh those that are entirely economic. *See Golden Gate Restaurant*, 512 F.3d at 1125. As discussed herein, plaintiff has shown what is principally monetary harm

that will probably result from implementation of the concession agreements.

Defendants, by contrast, could stand to incur significant non-monetary irreparable harm if the concession agreements, and the safety and environmental protection measures they contain, are enjoined. For example, although plaintiff argues that certain security-related provisions, such as the TWIC and the Registry, will be implemented regardless of whether the concession agreements are enjoined, the Ports nevertheless may experience significant hardships without the agreements, because the agreements allow the Ports to directly enforce the various security provisions against individual motor carriers, and to hold motor carriers responsible for the actions of their drivers. *See, e.g.,* Holmes Decl. ¶ 42–43. Furthermore, enjoining the concession agreements may hinder the ability of the Ports to hold motor carriers responsible for failure to comply with the Clean Trucks Program. *See, e.g.,* Knatz Decl. ¶ 31. Because a compromise in Port security and in the ability to enforce the Clean Trucks Program could both potentially lead to "preventable human suffering," the Court concludes that the balance of hardship tips in favor of defendants. *See Golden Gate,* 512 F.3d at 1125.

### D. PUBLIC INTEREST

■ Here, the public interest, like the balance of hardships, weighs in favor of denying an injunction. The public has a significant interest in ensuring that the Ports are safe from security concerns. Enjoining the concession agreements would have the potential to compromise security measures contained therein, which could significantly harm the public interest in secure ports. Furthermore, the public also has an important interest in ensuring that the environmental benefits from the Clean Trucks Program are implemented, and enjoining the concession agreements could limit defendants' ability to enforce

provisions of the program. *See* Opp'n at 49. Granting an injunction, by contrast, would not serve the public interest in any significant way.

### IV. CONCLUSION

Plaintiff has not demonstrated a likelihood of success in showing that there is not an exception to preemption under the FAAA by reason of the safety exception. Furthermore, plaintiff has not demonstrated that failure to grant the injunction will result in irreparable injury. Finally, the balance of hardships and the public interest tip decidedly in favor of denying the injunction. For the foregoing reasons, the Court DENIES plaintiff's motion for preliminary injunction.

IT IS SO ORDERED.